Charles T. DOUDS, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

MILK DRIVERS AND DAIRY EMPLOYEES LOCAL NO. 680, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, Respondent.

Civ. A. No. 496–55.

United States District Court
D. New Jersey.
July 11, 1955.

John J. Cuneo, Chief Law Officer, Second Region, N. L. R. B., New York City, by Charles M. Henderson, Washington, D. C., for petitioner.

Lloyd C. Anderson, Binghamton, N. Y., for charging party, Crowley's Milk Co., Inc.

Thomas L. Parsonnet, Newark, N. J., for respondent.

HARTSHORNE, District Judge.

The Regional Director in this jurisdiction of the National Labor Relations Board—N. L. R. B.—files his petition for an injunction under the Labor Management Relations Act of 1947, Sec. 10(j) (1), commonly known as the Taft-Hartley Act, as amended October 22, 1951, 29 U.S.C.A. § 141 et seq., to restrain the respondent, Local 680 of the International Brotherhood of Teamsters, etc. A.F.L., from engaging in alleged "unfair labor practices" within the meaning of Section 8 of such Act "pending the final adjudication of the Board with respect to such matter." Upon the hearing thereon oral evidence was taken on both sides for several days.

The specific issue is whether it is reasonable to believe that the respondent has been guilty of "an unfair labor practice" under the Act, and whether such unfair labor practice was apt to recur, pending final adjudication in that regard by the Board, so that the issuance of a temporary restraining order in that regard would be "just and proper". Shore, for and on Behalf of N. L. R. B. v. Building and Construction Trades Council, 3 Cir., 1949, 173 F.2d 678, 8 A.L.R.2d 731; Douds v. Wine, Liquor & Distillery Workers, D.C.N.Y.1948, 75 F.Supp. 447, 449. The specific unfair labor practice alleged to have been committed by the respondent "labor organization or its agents" was that it had taken steps "to induce or encourage the employees (of a secondary employer) * * * to engage in * * * concerted refusal * * * to * * * handle * * * any goods (of a primary employer) * * * where an object thereof is: (A) forcing or requiring any (secondary) employer * * * to cease doing business with (a primary employer) * * *." (Parentheses the Court's.) Ibid., Sec. 8(b) (4) (A).[1]

To constitute such an unfair labor practice, the following factors must therefore concur: (1) an inducement or encouragement to employees of a secondary employer, (2) for them to concertedly refuse to handle the goods of the primary employer, with (3) the object of forcing the secondary employer to cease doing business with the primary employer.

### Findings of Fact

(a) The parties agree that, as a fact, such was the object of the Union's action here. The parties further agree that in fact the letters of the Union in evidence constituted an inducement or encouragement to their members, employees of the secondary employers, not to handle the goods of the primary employer, the Crowley Milk Company—Crowley. But the respondents deny (1) that their ac-

---

1. Petitioner also alleges that the Union has committed another unfair labor practice, by the same acts, but for the different object, of forcing or requiring the primary employer to recognize a labor organization as the bargaining representative of its employees with it, when such organization is not already certified as such. Ibid. (B). But since this object is denied by the Union, whereas the object previously referred to is admitted by the Union, it seems needless for petitioner to pursue this more difficult goal, when the less difficult contention, if successfully supported by petitioner, will entitle it to the same relief.

tion went to the extent of inducing or encouraging their members to engage in a *concerted refusal* to handle Crowley's goods. Respondents further deny (2) that there was any such concerted refusal in fact. To simplify the matter further, it should be added that, if there was a refusal at all, this refusal was clearly concerted, since the action by the Union with respect to the many secondary employers involved, was substantially identic, and the action by the employees of these many secondary employers resulting from such Union action was in the main identic. Both parties further agree that, if there was a direct outstanding order by a secondary employer to handle the goods of Crowley, the primary employer, and this order was disobeyed, with the above admitted object, and it resulted, if and as the Union should reasonably have anticipated, from such admitted Union inducement or encouragement, then an unfair labor practice on the part of the Union would exist. But the N. L. R. B. contends that, given such an object and such an inducement, the further factor of a "refusal" on the part of the secondary employees, essential to constitute the alleged unfair labor practice, would exist, upon a mere showing that such secondary employer was unwilling to have his employees fail to handle Crowley's goods, even though the secondary employer did not order them to handle such goods. It is further admitted by the parties as a fact that at the time in question there was a "labor dispute" between Crowley and respondent Union.

In the light of these admissions by the parties, both legal and factual, and the contrary contentions of the parties in that regard, we turn to the facts and the law basic to the decision of such contentions.

(b) The facts are clear that Crowley's, the primary employer, was a large wholesale producer and distributor of milk and milk products, with its principal office in Binghamton, New York, and that it distributed therefrom to local milk product dealers in both New York and Pennsylvania, and practically throughout the entire extent of the State of New Jersey. Thus the activities of the respondent Union here, in affecting this distribution of milk and milk products throughout New Jersey, substantially affected interstate commerce, and comes within the jurisdiction of this Court.

(c) This Court further finds as a fact that among these local milk distributors, customers of Crowley's, were the secondary employers here involved, the North Jersey Dairyland, Inc., Sunrise Dairies, International Milk Company & Town Talk Ice Cream Company, and Thompson Dairy. Further, respondent is the collective bargaining representative of the employees of all such named secondary employers, as well as of a host of other similar customers of Crowley, not directly involved in this controversy.

(d) With all these secondary employers, the Union had a lengthy printed collective-bargaining contract, which contained a "hot cargo" clause, providing, in substance, "It shall not be a violation of this agreement for members of the Union to refuse to handle material in the possession of the Employer, received from any Employer with whom * * * Local 680 is directly engaged in a labor dispute * * *."[2]

(e) On March 9, 1955 respondent wrote all Crowley's secondary employers a letter, calling attention to its labor dispute with Crowley's, and to the "hot cargo" clause in its contract with such secondary employers, and adding that "We

2. The full "hot cargo" clause reads as follows:
"It shall not be a violation of this agreement for members of the Union to refuse to handle material in the possession of the Employer received from any employer with whom Local 338, or Local 584, or Local 602, or Local 607, or Local 680 is directly engaged in a labor dispute, provided such material comes into the Employer's possession more than 48 hours after the union gives written notice to the Employer of the existence of such labor dispute. It shall not be a

shall expect that, by or before April 1, 1955, you will discontinue receipt of any materials of Crowley's Milk Co. and will discontinue making deliveries or pickups to or from this company as long as this labor dispute continues. Your cooperation in this regard is urgently requested in order that we may avoid taking steps to enforce our contract." Concurrently the Union wrote all its shop stewards at the places of business of such secondary employers, enclosing a copy of such letter to such employers, and adding "Please see to it that all members under your jurisdiction will abide by the enclosed letter."

(f) Upon receipt of this letter from the Union, most of Crowley's customers stopped taking milk products from Crowley's. Upon receipt of both such letters, the Union's shop stewards, in some cases posted same on the bulletin board for the attention of the employees of the secondary employers, in some cases called the personal attention of the employees thereto, and that they were to "abide" by their rights to refuse to handle Crowley's material, and that the Union expected the employers of these employees to discontinue receipt of Crowley's goods.

These Union instructions could only mean to these common-sense milk handlers, members of the Union, that they were to do what they had a right to do, i. e., refuse to handle Crowley's milk, in the same way as the Union expected their employers to do the same thing. Respondent contends that these employees understood, as did the shop stewards, that these specific written instructions from the Union were not meant to override, and would not be understood by its member employees to override, some general discussions at certain Union meetings, unspecified, of the further clause in the collective-bargaining contract that the men were subject to dis-

missal if they refused to obey their employers' orders. Thus, by inference, it would follow that they were not to disobey an employer's order, but to obey it, and then report the incident to the steward, to be taken up with the Union. Further, that all this was meant to be read in connection with the above letters.

But there are several difficulties with this contention. The first is, that while these letters of instructions, by which the members were to "abide", expressly alluded to their rights under the contract not to handle Crowley's goods and the Union's expectation that their employers would not handle such goods, such letters in no wise referred to these discussions about obeying an order. Indeed, such letters did not even refer to the clause in the contract regarding dismissal for disobedience of orders. Further, this clause itself was largely nullified by the "hot cargo" clause. For the right it gave the member employees to refuse to handle Crowley's goods, would prevent them from being dismissed for refusal to obey even a direct order from their employer to handle Crowley's goods. Again, in the only case where such a direct order was issued, and where therefore this issue as to the effect of such letter on the secondary employees was raised, the result was that the men disobeyed such order, and at the direction of the shop steward. This, of itself, shows how these milk handlers, not lawyers, viewed this explicit letter.

Finally, the statement of the Union's Secretary-Treasurer, both in his letter to Thompson's Dairy, and in his statement to Attorney Goodwin, North Jersey's lawyer, that "Our members will not handle Crowley's milk or milk products", either meant exactly the same thing, or else it was a misstatement of fact to the secondary employers of the intention of the Union and its employee members.

violation of this agreement for the members of the union to refuse to make deliveries to or pickups from any employer with whom Local 338, Local 584, or Local 602, or Local 607, or Local 680 is

directly engaged in a labor dispute, provided such refusal occurs more than 48 hours after the union has given written notice to the Employer of the existence of such labor dispute."

(g) In short, this Court finds that it is reasonable to believe that these letters of the Union to the employees, through the shop stewards, must reasonably have been expected, and were therefore intended, by the Union to encourage its members to engage in a "concerted refusal * * * to handle * * * goods" of Crowley. They thus constituted, when communicated to its employee members, with its admitted object, an "unfair labor practice". This is regardless of whether or not this encouragement actually resulted ultimately in such a refusal, due to other causes. N. L. R. B. v. Denver Bldg. & Const. Trades Council, 10 Cir., 1952, 193 F.2d 421.

However, it is clear that the very next day the Union countermanded this refusal of a direct order by the member employees of North Jersey Dairyland to handle Crowley's goods, and upon the basis above alluded to. So this instance is clearly not apt to recur. We must therefore analyze the remaining evidence.

Since the above is the only evidence of a direct order from a secondary employer, compliance with which was refused by his employees, under direction of a Union agent, we turn to the question of whether a further contention of the N. L. R. B. is correct, which is denied by the respondent Union. This is that the mere unwillingness of the secondary employer to have secondary employees fail to handle Crowley's products, suffices to constitute such failure the "refusal", necessary under the statute to constitute an unfair labor practice, when this unwillingness, instead of being effectuated by an order to his employees, is followed up, though unwillingly, by the employer's acquiescence in the failure of such employees to handle such goods.

(h) There is no question in fact but what this situation occurred with regard to several of the above-named secondary employers. So this question is not one of fact, but solely of law. Since this statutory refusal is an act of the employee, his employer's unwillingness cannot per se constitute such a refusal. It can only constitute a condition in the light of which the action of the employee is to be considered, as being a refusal or not. Nor is a mere failure of an employee to handle goods per se a refusal. Such failure may perchance have been due to negligence, or inattention caused by other reasons. On the other hand, "refusal" connotes an intentional unwillingness on the part of the employee to do what he is asked to do. This asking may be by an explicit direct order, but since "actions speak louder than words" in such a common-sense situation as this, no particular form of words is essential. Thus a standing order to an employee, if called to the attention of the employee, and not countermanded in some way, might well constitute an asking by the employer, and a following failure to comply would constitute a "refusal" on the part of such employee. McAllister Transfer Co., 110 N. L. R. B. No. 224. We thus turn again to the facts to see if such an order, formal or informal, was refused by the respondent Union member employees here.

The only testimony showing such an informal order to handle Crowley's products is that of the International Milk Company, where there was a standing order to handle Crowley's and other milk products as delivered at the plant. But thereafter, following some conversation with both the shop steward and the Union, the International president, though somewhat against his will, acquiesced in his employees' failure to handle Crowley's products, and thus, essentially, withdrew the effect of such standing order as to Crowley. That is, he did so, unless his involuntary withdrawal of such standing order is itself nullified, because it was perchance an involuntary act caused by possible Union duress.

This does not mean that any threats by the Union against the employer himself would constitute an unfair labor practice under the Taft-Hartley Act. For the act does not so provide. See Sealright Pacific, Ltd., 82 N.L.R.B. 271; Local 878, International Brotherhood of Teamsters, etc., 92 N.L.R.B. 255. On the other hand, the Taft-Hart-

ley Act does not say that duress, invalid at common law, is validated. Thus, while any such invalid acts at common law are not a violation of the statute, they may still remain unlawful at common law. In short, a misrepresentation of facts or duress, despite the act, still remain a misrepresentation of facts or duress. Thus it may well be, that if the Union threatened the employer, whether meaning it or not, with causing his employees to strike, under conditions which would amount to an unfair labor practice on their part if carried out by such employees, the same might constitute duress at common law. Restatement, Contracts, Sec. 492, comment g; Brownell v. Schering Corp., D.C.N.J.1955, 129 F. Supp. 879. And it is well settled that any act resulting from unlawful coercion or duress is not binding. Thus, if such duress were exerted, and the secondary employer, the International Milk Company, did acquiesce as above as a result of the same, such acquiescence might be nullified, and the International's standing order to handle Crowley's milk would still remain in effect. But this issue, which may well properly arise on the hearing before the National Labor Relations Board, cannot be passed on by this Court, since the evidence does not make it clear what the action of the Union was, which caused International's involuntary acquiescence in the obliteration of the above standing order.

■ The Union further relies on the "hot cargo" clause as preventing any of the above situations from showing an "unfair labor practice" on their part. This claim is based on the contention, as stated in respondent's brief, that "The employers were bound by contract not to insist that their employees handle the Crowley products". But this contention would seem unsound. For, if the "hot cargo" clause does bind the secondary employer not to order his employees to handle Crowley's products, then, as seen above, the statutorily requisite "refusal" by such employees can never exist. Then a secondary boycott, based on such a refusal, can never amount to an unfair labor practice. Then both the Union and the secondary employer, by entering into this "hot cargo" clause contract, will have contracted to nullify the very protection of the public which the Taft-Hartley Act was designed to afford.[3] It follows that if the "hot cargo" clause thus violates in essence this important provision and intention of the statute, such clause is contrary to public policy and void.

■ On the other hand the Union's construction of the "hot cargo" clause would not seem the proper one. Indeed it is difficult to see how a contract between an employer and his employees can affect the rights of the public, who are not a party to such contract. The natural and reasonable construction of the "hot cargo" clause would seem to be, that it affects only the rights of the parties thereto. Specifically, that in exempting the employees from the duty to handle the products of an employer in the midst of a labor dispute, the clause simply means that this right of the employees exempts them from being dismissed by their employer, should they disobey his orders to handle such products. But this protection of the employees, arising from the "hot cargo" clause, in no wise affects or diminishes the protection which the Taft-Hartley Act has thrown about the public, in proscribing unfair labor practices in the form of the secondary boycott alluded to in Section 8. Nor is this at all contrary to Rabouin v. N. L. R. B. (Conway's Case), 2 Cir., 1952, 195

3. The Act in its very preamble makes it clear that "Employers, employees, and labor organizations (should) * * * above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest.
"It is the purpose and policy of this Act, in order to promote the full flow of commerce * * * to proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce." Taft-Hartley Act, as above, Section 1(b).

F.2d 906, 912. And it is quite in accord with the opinion of Chairman Farmer of the N. L. R. B. in McAllister, supra. For in Conway there was no order issued by the employer to his employee. Such an order would obviously affect his previous consent implied from the "hot cargo" clause. And in McAllister, Chairman Farmer called attention to the fact that while the "hot cargo" clause, properly construed, is not per se a violation of the Taft-Hartley Act, despite it, a later order of the employer would turn a failure of his employees to handle goods into a statutory "refusal", basic to an "unfair labor practice". However, while in McAllister, Chairman Farmer found that in fact there had been a re-affirmation of standing orders to handle such goods, in the case at bar no such re-affirmation, for one reason or another, would appear to exist.

## Conclusions of Law

(1) As a result of the above, we find that there is reasonable cause to believe that an unfair labor practice on the part of the respondent has occurred, in its encouragement of its employees to concertedly refuse to handle Crowley's products for the proscribed object. But we find that in addition there has been but a single such refusal, and that such refusal lasted for but a day. Furthermore, the very cancellation by the Union of this refusal the day after it occurred, plus the repeated explicit statements before this Court on the part of responsible counsel as well as Union officials, show very clearly that the Union will not countenance a failure of its members, as employees, to handle Crowley's goods, the minute they are clearly ordered to do so by any such secondary employer.

(2) It is thus clear that on the evidence in this case this Court cannot find that any such labor practice is apt to recur.

(3) Under such circumstances it would not be "just and proper" to issue the injunctive relief prayed for by the petitioner.

However, in order that the public, whose welfare is the primary concern of the Congress, may not be unduly jeopardized, the petition herein will not be dismissed, but may lie open upon the records of this Court. Thus, if there is reasonable cause to believe in the future that any such labor practice is apt to recur, prompt application may be made to this Court under said petition, in the light of any such further evidence.