Bernard L. ALPERT, Regional Director of the First Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board

v.

UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL–CIO, Richard P. Griffin and Frank Barry, its Agents, Carpenters' District Council of Springfield, Massachusetts, AFL–CIO, and Walter J. LaFrancis and Harry P. Hogan, its Agents.

Civ. A. No. 56–533.

United States District Court
D. Massachusetts.

July 12, 1956.

Theophil C. Kammholz, General Counsel, Winthrop A. Johns, Asst. General Counsel, Washington, D. C., Robert E. Greene, Chief Law Officer, Boston, Mass., Joseph I. Nachman, Atty., N. L. R. B., Washington, D. C., Arthur M. Marshall, Springfield, Mass., for plaintiff.

John I. Robinson, Springfield, Mass., for defendant.

ALDRICH, District Judge.

This is an application for a temporary injunction made by the regional director of the National Labor Relations Board, hereafter called petitioner and the Board, pursuant to § 10(l) of the National Labor Relations Act, 61 Stat. 136, as amended, 29 U.S.C.A. § 141 et seq., hereafter called the Act. The defendants' answer admits a number of the allegations in the complaint; a stipulation covers a number of other matters, and as to the balance I took evidence. The defendants, hereafter collectively called the Union unless otherwise specifically designated, on May 31, 1956 struck a job on the Chicopee Housing Project, hereafter called Chicopee, on which J. G. Roy and Sons Company, hereinafter called Roy Sons, was the general contractor. On June 4, 1956 Roy Sons filed a charge with the Board alleging that the Union was engaging in unfair labor

practices within the meaning of § (8) (b), subsection (4) (A) and (B) of the Act. This complaint precipitated the present proceedings.

Roy Sons was incorporated in 1919. It was a family corporation. Since 1936 all the stock has been held in equal amounts by the five Roy sons. In 1924, J. G. Roy Lumber Company, hereinafter called Roy Lumber, was incorporated. The five sons have held its stock equally since 1936. All five sons are the directors of each company. Two are the officers of one company, and two others are the officers of the other company. The four who are officers receive substantially equal salaries. I find that while the active four brothers have a general idea of what is going on in both companies, the officers very substantially manage and control their particular company, without interference, assistance or control by the others. I believe this has been a working family arrangement over the years.

Since at least 1954 there has been a union shop at Roy Sons, and a contract which provides in substance, inter alia, that "employees shall not work nor install any form of lumber precut by Non-Union carpenters." The contract is part of a collective bargaining agreement between the Union and a number of general contractors in the Springfield, Massachusetts area, of which Roy Sons is one. The present agreement runs into 1957.

Although the general contractors in the area are organized, the building supply houses, of which Roy Lumber is one, are not. In September, 1954 the Union began what it termed an educational campaign to persuade the supply houses of the advantages of a union shop. This was done by conferences with individual employers, and later with their joint representative. It was carried out only at that level, and in an entirely amicable manner. Its ultimate purpose was to persuade the supply houses to recognize the Union and execute an agreement therewith. By February, 1956 it was apparent that this program was not going to succeed.

In addition to such direct persuasion the Union conferred from time to time with the general contractors with regard to living up to the provisions of their agreement respecting non-union precut lumber. Precut lumber is known as finishing. The contractors pointed out the impracticality of this in the light of the unavailability of union finishing in the area. The Union gave the contractors a list of union shops in New England and New York, but I find that the parties on this list were in no way prepared or willing adequately to service the Springfield area. The Union recognized this situation, and until the present difficulty took no steps of an aggressive nature.

In the spring of 1956 Roy Sons was working on a number of jobs, including Chicopee. It purchased many of its supplies from Roy Lumber, but when it could purchase more advantageously elsewhere, it did so. It has no contract with Roy Lumber. Its purchases from it included non-union finishing. With respect to Chicopee it happened that the finishing purchased from Roy Lumber had been bought by Roy Lumber from union shops, and had not been cut by Roy Lumber non-union men. The Union officials testified that they observed no union labels on uninstalled finishing at Chicopee, but I do not find that they made any particular effort to verify the prior history of this material, being satisfied, correctly, that at least on some jobs Roy Sons was using non-union finishing in violation of its agreement.[1]

In February, 1956 the Union had its last meeting with the contractors. It stated that it had been unsuccessful in organizing the supply houses and that if

---

1. The Union may well have believed that non-union finishing was being installed on this job. However, this whole matter seems to me irrelevant. Non-union finishing was being used on other jobs, as all parties recognized, so Roy Sons was admittedly in violation. On the other hand, admittedly the other Roy Sons jobs were not interfered with.

the contractors generally did not recognize, so far as practical, their undertaking not to use non-union finishing it might pull some of their men. The president of Roy Sons discussed this briefly with the president of Roy Lumber, but upon the latter stating that he did not want to recognize the union, he did not press the matter. Towards the end of May the respondent Griffin, the Union's New England Special Representative, or supervisor, asked Roy Sons to influence Roy Lumber to unionize, but Roy Sons declined to interfere. Griffin testified that he felt it was wrong morally and legally, because of the connections between these two companies, to have a union shop in one and not in the other. At this time he told Roy Sons that he felt he would have to do something in line with the non-union finishing clause in the agreement. This something proved to be the striking of the Chicopee job, at a time when the work was about 98% complete. Roy Sons' other jobs have not been struck or picketed, and I assume that this strike may, accordingly, have been where it would be most felt by Roy Sons, and least felt by the Union. No other general contractors have been struck or picketed, and no organizational activity has taken place among the employees of, or picketing at, any supply houses during the entire period.

The question before me is whether the petitioner has reasonable cause to believe that the strike is an unfair labor practice as aforesaid. No jurisdictional questions are raised and the only defenses are those about to be discussed.

■ *Primary v. Secondary Activity.* The Union contends that the strike was motivated solely by reason of Roy Sons' failure to observe the requirement of Union finishing. I think the petitioner has at least reasonable cause to believe otherwise. It seems apparent that the primary purpose of the Union is to organize the supply houses, and in this instance particularly Roy Lumber. Not only is this the history, both remote and immediate, but although Griffin testified that his "chief concern" was "not to disturb our relations [which I take to mean enforce the contract] with the Union contractors," he admitted that the "ultimate" "hope and purpose" was to induce the suppliers to sign a contract. I tie these two together. There was no testimony, and I do not find, that the non-union finishing provision was to improve or affect the working conditions of the contractor's employees. It would be unrealistic not to recognize that the Union's primary interest in this contractual provision was to assist it in its relationship, or attempted relationships, with other parties. While it was true that no organizational activities were carried on with supply house employees, I believe the petitioner is reasonable in concluding that an object of the strike is to organize Roy Lumber.

The Union asks me to find that it wishes to enforce the non-union finishing clause of its agreement. I believe it does so wish, but only for the effect it may have in assisting it to organize the supply houses.

■ *Hot Cargo.* The Union's contention that what might otherwise be an unlawful activity is legalized by virtue of Roy Sons' agreement not to use non-union finishing presents a more vexing question. The Board at one time subscribed to the Union's position. Its most recent pronouncement, however, is to the contrary. Local 1976, United Brotherhood of Carpenters, etc., and Sand Door and Plywood Co., 113 N.L.R.B. 1210. On the other hand, in Rabouin, (d/b/a Conway's Express) v. National Labor Relations Board, 2 Cir., 195 F.2d 906, a majority of the court, with little discussion, has held that such a clause constitutes consent insulating the provisions of § (8) (b) (4) (A).

The question of which of these views is correct may depend upon the scope and force of the Act. If its sole purpose is the protection of the individual employer against particular activities, then the question would be the narrow one of whether that protection can be bargained away, or whether within the

scope of the protection was included an inability to surrender it, just as an infant cannot waive the defense of infancy. On the other hand, if the purpose of the Act is broader, to protect the interest of the others, whether the employer who is the union's primary objective, or the public at large, then, obviously contractual waiver by a party such as Roy Sons here could be of no moment. The fact, among other circumstances, that the injunctive right is given to the Board, and not to the individual employer, indicates to me that the protection is intended for more than that employer. See Pope, C. J., concurring, in Brown v. Pacific Telephone and Telegraph Co., 9 Cir., 218 F.2d 542, 544. The public at large, particularly where interstate commerce is involved, is interested in not having strikes extend far afield. See full discussion by Senator Taft in Vol. 93 Congr.Rec. p. 4198, referred to infra. I agree with the Board's most recent opinion, that the parties cannot by contract take away the right which the Act gives it to assert. See, also, Douds v. Milk Drivers & Dairy Employees Local No. 680, D.C.D.N.J., 133 F.Supp. 336, 341.

■ *The Doctrine of Non-Neutrals*

The Union contends that Roy Lumber is not "[an]other employer" and that Roy Sons is not "doing business with any other person" within the meaning of § 8(b) of the Act; that the test is common ownership and common management, and that this test has been met. The consideration of this aspect of the case involves perhaps more analysis of the situation than the parties have made. I think the frame of reference in which the question comes up is important. The Union describes the doctrine as the "ally or non-neutral theory," and cites Douds v. Metropolitan Federation of Architects, etc., D.C.S.D.N.Y., 75 F. Supp. 672. That case did involve two concerns having common ownership and control. However, the question at issue was whether a complaint could be made because of the transfer of struck work

from one to the other. The recent decision of National Labor Relations Board v. Business Machines and Office Appliance Mechanics, etc., Local 459, 2 Cir., 228 F.2d 553, makes it clear that it is the transfer of such work, and not common ownership, on which the doctrine is based.

A principle of allied or non-neutral employers in the sense that the Union would have it applied here stems from language in the Douds case, wherein the court quoted, 75 F.Supp. at page 676, two sentences by Senator Taft, during the course of the debate on the bill, about its applying only to employers " 'wholly unconcerned in the disagreement.' " I do not think this quotation adequately states Senator Taft's views. It was a fair quotation when the matter under consideration was the question presented in the Douds case—namely, a related employer taking over the other's struck work. Senator Taft made it apparent on a later occasion that this was what he was talking about. See Vol. 95, Congr. Rec. p. 8709. Subsequent cases have quoted Senator Taft's earlier remarks without examining the context in which they were used. This is evidenced by the fact that the court in the Douds case gave as the reference Vol. 93 Congr. Rec. p. 4323, whereas in fact, the proper reference is page 4198, and the subsequent quoters have given the court's miscitation. See, e. g., Clark, C. J., dissenting, in International Brotherhood of Elec. Workers v. National Labor Relations Board, 2 Cir., 181 F.2d 34, 42; Murdock dissenting, in the National Cement Products Company case, 115 N.L. R.B. No. 206; National Union of Marine Cooks and Stewards, etc., Irwin-Lyons Lumber Company, 87 N.L.R.B. 54, 56. Judge Lumbard's opinion in N.L.R. B. v. Business Machines and Office Appliance, etc., 2 Cir., 228 F.2d 553, at page 558, makes clear Senator Taft's meaning.

"Concerned" means related or connected through activities, not through the incident of ownership, or management.

Obviously, ordinary buying and selling is not such a connecting activity, as that is precisely what is insulated or protected by the Act.[2] What Senator Taft was talking about was a return to the common law.[3]

I might not quarrel with the "one total (single economic) operation" rule of the Irwin Lyons Lumber Co. case, supra, but I think it an entirely different matter to consider that a second corporation is "\* \* \* concerned in the disagreement between an employer and his employees," when the two corporations are regularly engaged in entirely separate enterprises, and the business of the one is unrelated to that of the other except when on occasion they choose to deal with each other, and the Union's "disagreement" involves organizing the one not struck. On the evidence presented petitioner has reasonable cause to believe Roy Sons is not an ally or non-neutral.

I find that the strike is a continuing affair of consequence and that it is just and proper that petitioner have relief.

Injunction to issue.

2. That "common management and control" is not the proper test may be illustrated by an example. Suppose that one individual or group owns and manages a newspaper and also an oil supply company. Would it be said that the newspaper was "concerned" in the oil company's labor relations, even if the latter bought advertising space in the paper, or the newspaper's trucks were customers of its filling station?

3. I cannot agree with the court in National Labor Relations Board v. Wine, Liquor & Distillery Workers Union, 2 Cir., 178 F.2d 584, 16 A.L.R.2d 762, that all secondary boycotts were prohibited, whether unlawful at common law or not, because, again, the court cited only part of what Senator Taft said, 178 F.2d 584, at pages 586–587. A fuller, but still incomplete, quotation is as follows:

"Mr. Taft. I do not quite understand the case which the Senator [Pepper] has put. This provision makes it unlawful to resort to a secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employees. The Senator will find a great many decisions written by my father which hold that under the common law a secondary boycott is unlawful. Subsequently, under the provisions of the Norris-LaGuardia Act [29 U.S.C.A. § 101 et seq.], it became impossible to stop a secondary boycott or any other kind of a strike, no matter how unlawful it may have been at common law. All this provision of the bill does is to reverse the effect of the law as to secondary boycotts. It has been set forth that there are good secondary boycotts and bad secondary boycotts. Our committee heard evidence for weeks and never succeeded in having anyone tell us any difference between different kinds of secondary boycotts. So we have so broadened the provision dealing with secondary boycotts as to make them an unfair labor practice."

For a further discussion of what is a "concerned" employer, see International Brotherhood of Elec. Workers v. National Labor Relations Board, 2 Cir., 181 F.2d 34, affirmed 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299.