Charles T. DOUDS, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner-Appellee,

v.

MILK DRIVERS and DAIRY EMPLOYEES UNION LOCAL 584, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN and HELPERS OF AMERICA, AFL-CIO, Respondent-Appellant.

No. 402, Docket 24762.

United States Court of Appeals Second Circuit.

Argued Sept. 23, 1957.

Decided Oct. 2, 1957.

Samuel J. Cohen, New York City (Henry Weiss, Donald S. Winograd, New York City, on the brief), for respondent-appellant.

Jerome D. Fenton, Gen. Counsel, Stephen Leonard, Associate Gen. Counsel, Winthrop A. Johns, Asst. Gen. Counsel, Sidney D. Goldberg, Atty., N. L. R. B., Washington, D. C., for petitioner-appellee.

Weisman, Allan, Spett & Sheinberg, New York City (David Jaffe, New York City, on the brief), for Home Milk Delivery Ass'n.

Weil, Gotshal & Manges, New York City (Robert Abelow, Milton Haselkorn, Marshall C. Berger, New York City, on the brief), for Chesterfield Farms, Inc. et al.

Before MEDINA, LUMBARD and MOORE, Circuit Judges.

MOORE, Circuit Judge.

This is an appeal from an order granting a temporary injunction pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(*l*) pending final disposition by the National Labor Relations Board (referred to as the "Board"), of various charges filed with the Board alleging that the respondent-appellant (referred to as the "Union") had committed unfair labor practices within the scope of Sections 8(b) (4) (A) and (4) (B) of the Act, popularly called the "secondary boycott" provisions.

The proceeding was initiated by a petition filed in the District Court on June 5, 1957 by the petitioner-appellee (referred to as the "Director") on behalf of the Board praying for a temporary restraining order against the Union. Sufficient cause having been shown, the District Court issued a temporary restraining order and expeditiously held hearings on June 7th and 10th. On June 13th the Court rendered its decision with findings of fact and conclusions of law granting a temporary injunction in favor of the Director. However, before any order thereon was entered this Court on June 19, 1957 handed down its decision in Milk Drivers & Dairy Emp., etc. v. N. L. R. B., 2 Cir., 1957, 245 F.2d 817, petition for certiorari filed Aug. 29, 1957, 26 U. S. Law Week 3093, a case which was said by the Union during the hearings to be very similar to the case now before us. On its own motion the District Court requested reargument in the light of that decision. Extensive argument took place on June 24th and on June 27th the Court filed its "Opinion on Rehearing" with additional conclusions of law in favor of the Director. On July 2nd the order granting a temporary injunction against the Union was made and entered. On July 3rd the Union appealed and although a stay was denied this Court advanced the appeal for argument.

To understand the issues now before this Court at this stage of the proceedings, a brief review of the Act,[1] the procedures prescribed by Congress thereunder and the facts is necessary.

When Congress passed the Act it incorporated therein its "Congressional declaration of purpose and policy" which clearly evinced its concern not only for the rights of labor and the employer but also for "the public health, safety, or interest," 61 Stat. 136, 29 U.S.C.A. § 141.

To safeguard these rights a comprehensive set of procedural rules was

---

1. Labor Management Relations Act of 1947, as amended, 61 Stat. 136, 29 U.S.C.A. § 141 et seq.

**536**

enacted, Section 10(*l*) of the Act; 29 U.S.C.A. § 160(*l*). Acting within the framework of these rules, on May 29, 1957 Chesterfield Farms, Inc., a milk distributor, filed charges with the Board alleging that the Union was engaging in unfair labor practices, i. e., in substance, creating a secondary boycott. On June 4, 1957 Home Milk Delivery Association filed similar charges. The Director thereafter filed his petition in the District Court alleging that he had conducted an investigation and that he had "reasonable cause to believe that said charges are true" (Petition, pars. 5 and 6). The Union answered and proof upon the issues was taken.

The Union (Local 584) is the bargaining representative for the employees of many milk dealers in New York City. There are three classes of milk dealers in this area: Class A, Class B, and Class C. They are licensed by the New York State Department of Agriculture and the New York City Department of Health, Class A to receive raw milk, and to bottle and sell it to Class B dealers and wholesale and retail customers; Class B dealers to receive their milk from Class A dealers and resell it to Class C dealers and retail customers; and Class C dealers to receive their milk from Class B dealers. By license Class C dealers are restricted to operating a single truck and to servicing a single retail route.

In May of 1957, Local 584, which then represented employees of A and B dealers, embarked on a drive to organize the employees of C dealers.

There are approximately 350 home delivery C dealers in New York City servicing about 600,000 people. Some of the C dealers operate without help, but a substantial number have one or two part-time or full-time employees. About half of these C dealers load and unload their trucks at B dealers' platforms, while the other C dealer trucks are loaded and unloaded at B dealer platforms by employees of B dealers. Never is the transfer of milk from a B dealer to a C dealer done at any place other than the platform of the B dealer.

Some time in May 1957, the Union demanded that C dealers having employees sign a contract covering such employees although the Union had not been certified by the Board as the collective bargaining agent for the C employees.

To achieve its objective of organizing the C dealers the Union decided to use concerted economic pressure (and so admitted during the hearings and on argument here) against the C dealers having employees by cutting off their sole supply of milk from the B dealers. This it did by notifying the B dealers not to load milk for, or even permit milk to be taken out by, such C dealers. In addition the Union told certain A dealers not to bottle milk for the B dealers involved. If these instructions were violated, the Union threatened to take its men out. The B dealers, however, insisted that their employees handle milk destined for the C dealers. As a result of the Union's instructions none of these C dealers obtained milk for its customers from Chesterfield on June 5, 1957 and some twelve C dealers failed to obtain milk from Whitestone Farms, Inc., another B dealer.

There was presented more than sufficient proof that if C dealers did not obtain milk even for a few days their routes would disappear and that the business of the C dealers and their suppliers, the B dealers, would be irreparably damaged.

The Union, in effect, concedes that its actions would constitute concerted economic pressure of a type proscribed by Sections 8(b) (4) (A) and (4) (B) but contends that by its Milk Industry Collective Bargaining Agreement with A and B dealers, more particularly Paragraph 18, commonly referred to as the "hot cargo" clause, that the employers (the A and B dealers) voluntarily agreed in advance that such activities by the Union should be in effect excepted from the terms of the statute and not be deemed to be a violation of the Agreement which provides that:

"18. (a) No strikes, lockouts, walkouts or slowdowns shall be ordered sanctioned or enforced by

either party hereto against the other during the life of this Agreement, except as hereinafter provided."

Subdivision (d) of Paragraph 18, excluding the first sentence which is not applicable under the facts, reads:

"It shall not be a violation of this Agreement for the members of the Union to refuse to make deliveries to or pickups from any employer with whom Local 338, Local 584, or Local 602, or Local 607, or Local 680 is directly engaged in a labor dispute, provided such refusal occurs more than 48 hours after the Union has given written notice to the Employer of the existence of such labor dispute."

The Union argues that the words "deliveries to and pickups from" cover the platform operations at the B dealers' plants and refers to Webster's Dictionary, to other parts of the Agreement and to certain cases to support its argument. The Director and the B and C dealers also refer to the same sources to prove the contrary.[2]

The Director and the B and C dealers contend that the Union is not "directly engaged in a labor dispute" with the A and B dealers. The Union asserts that it has a dispute with the C dealers and that the dispute with the Bs is due to the fact that "the Bs were declining to honor the contract provision" (180a), i. e., the "hot cargo" clause. This dispute with the B dealers, it claims justified its demand that the A dealers shut off the objecting B dealers' supply of milk.

The charging parties, Chesterfield and Home Milk Delivery point to the explicit arbitration provision of the Agreement (pars. 23 and 24) calling for arbitration of "Any and all disputes and controversies" and for no strikes except

against the party failing to comply with the arbitrator's decision and assert that arbitration was requested (Charging Parties Exh. 1; Union reply thereto, Exh. A).

■ The District Court was not required to make final or even preliminary findings as to the truth or falsity of the facts alleged in the petition of the Director. By the terms of § 10(l) the Court's function is limited to ascertaining whether the Director could have "reasonable cause to believe" that the charges filed were true and to granting such equitable relief "as it deems just and proper."

This Court has described the district court's function as one of determining whether the Board has come forward with evidence sufficient to spell out a likelihood of violation, saying in Douds v. International Longshoremen's Ass'n, 2 Cir., 1957, 242 F.2d 808, 810:

"The District Court, moreover, on the record before us had no alternative other than to find that there is more than enough evidence to demonstrate that there was basis for the Board's finding that it had 'reasonable cause to believe' that the 'charge' filed by the Painters' Union is true. It is settled law that no more is required on this phase of the case."

■ On appeal from the discretionary action by the Director and the District Court this Court is limited to the question whether the District Court was or was not reasonable in concluding that the Director had cause to believe that the charges were true. The scope of review is succinctly delineated in Schauffler v. Highway Truck Drivers & Helpers, 3 Cir., 1956, 230 F.2d 7, 9:

2. The Union relies on a provision in the Agreement providing for commissions of routemen on "platform deliveries" to show that the term "deliveries" encompasses platform operations. Other portions of the Agreement, however, tend to support the position of the Director and the B and C dealers. Thus the parties

used the word "load" as distinguished from "delivery" in Sec. 40.B.5(b) of Schedule B of the Agreement. Moreover, in Sections 52, 62A and 62C of Schedule B, the parties seemingly used "delivery" in the sense of transporting goods.

"It is to be observed that section 10(*l*), under which the issuing of a preliminary injunction is authorized, requires the district judge to find that there is reasonable cause to believe that a violation of the act as charged has been committed. Our review, therefore, is simply to determine whether the finding of a reasonable cause is not clearly erroneous under 52(a), Fed.Rules Civ. Proc. 28 U.S.C.,[2] and whether the form of relief granted shows a proper exercise of judicial discretion. This puts a lighter burden on both the district judge and ourselves than if final findings of ultimate fact were required. That task is, of course, for the labor relations board subject to review by this Court if and when enforcement is sought here."

See also Douds v. International Longshoremen's Ass'n, 2 Cir., 1957, 241 F.2d 278, 281, 285 [§ 10(j)].

█ The Union asks us now, and in advance of any final determination by the Board as to the law and facts, to declare that there has been by specific agreement a broad waiver of the provisions of Sections 8(b) (4) (A) and (B) which makes it impossible thereafter for the Union to violate them. In so doing it relies heavily upon this Court's recent decision of June 19, 1957, supra.

To what extent employers and labor unions may by agreement modify or nullify (if at all) the laws enacted by Congress for the protection of the public is a question not presently before us. Congress has vested in the Board the responsibility of hearing and making a final order upon complaints filed. From such an order the parties may appeal [Sec. 10(f)]. It is significant that this is the only appeal mentioned in a comprehensive and self-sufficient section (Sec. 10). The present appeal comes to us pursuant to other provisions of law relating to injunctions. This Court can-

not, and should not try to, usurp the function and duty of the Board. Nor should it endeavor to speculate on the law or facts which may eventually underlie the Board's decision.

Single and narrow issues are before us at this time, i. e., (1) did the Director and the District Court have before them facts indicating "reasonable cause"; (2) was the injunctive relief sought "appropriate"; and (3) was the relief granted "just and proper."

The findings of fact and conclusions of law made by the District Court amply sustain its decision that in view of the irreparable injury threatened that there should be a temporary injunction "pending the final disposition of the matter now before the National Labor Relations Board" (259a).

The order appealed from is affirmed.

LUMBARD, Circuit Judge (concurring).

While concurring, I would have preferred that the question of union implementation of "hot cargo" clauses be critically reexamined, as the decisions of this Court in Rabouin v. N. L. R. B., 2 Cir., 1952, 195 F.2d 906, and in Milk Drivers & Dairy Emp., etc. v. N. L. R. B., 2 Cir., 1957, 245 F.2d 817, seem to me to be contrary to both plain statutory language and the intent of the Congress. See N. L. R. B. v. Local 1976, United Brotherhood of Carpenters and Joiners, 9 Cir., 1957, 241 F.2d 147; Alpert v. United Brotherhood of Carpenters and Joiners, D.C.Mass.1956, 143 F.Supp. 371; Douds v. Milk Drivers & Dairy Employees Local No. 680, D.C.N.J.1955, 133 F.Supp. 336; and Judge Levet's first opinion of June 13, 1957 in the cause now before this Court, 154 F.Supp. 222. See also N. L. R. B. v. Local 11, United Brotherhood of Carpenters and Joiners, 6 Cir., 1957, 242 F.2d 932. Contra: General Drivers, Chauffeurs, Warehousemen and Helpers Union, Local No. 886 v. N. L. R. B., D.C.Cir.,

2. Shore, for and on Behalf of N. L. R. B. v. Building & Construction Trades Council,

3 Cir., 1949, 173 F.2d 678, 681, 8 A.L.R. 2d 731.

1957, 247 F.2d 71. If Congress intended to protect the public and, in the case of § 8(b) (4) (B) of the Labor Management Relations Act of 1947, primary employers, from the effect of secondary boycotts, and I believe it did so intend, other parties cannot insulate themselves by contract from such statutory prohibitions.