John A. PENELLO, Regional Director of the Fifth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board,

v.

MILK DRIVERS AND DAIRY EMPLOYEES LOCAL UNION NO. 246, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL-CIO.

Civ. A. No. 10037.

United States District Court
D. Maryland,
Civil Division.

Oct. 23, 1957.

1. See the strict construction of an extra-territorial service statute in United States v. Rhoades, D.C.D.Colo., 14 F.R.D. 373.

Stephen Leonard, Winthrop A. Johns, Washington, D. C., David C. Sachs, Baltimore, Md., Allen R. DeLong, Washington, D. C., for petitioner.

John J. McBurney, Washington, D. C., for respondent.

CHESNUT, District Judge.

In this case the National Labor Relations Board, through its Regional Director, Penello, whose principal office is located at Baltimore in this District, has filed a petition for the issuance of an interlocutory injunction to enjoin the respondent Labor Union from conducting a secondary boycott. This proceeding is authorized by statute, 29 U.S.C.A. § 160 (j), codifying § 10(1) of the National Labor Management Act, popularly called the Taft-Hartley Act. It reads:

"(j) The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."

The procedure authorized by the statute requires from this court only the determination whether there is "reasonable cause to believe" that a secondary boy-

cott has occurred. Sinclair Refining Co. v. Midland Oil Co., 4 Cir., 1932, 55 F.2d 42; Douds v. Milk Drivers and Dairy Employees Union Local 584, 2 Cir., 248 F.2d 534. This court does not have the power to determine that ultimate question which is left primarily to the Labor Board. There is further provision in the Act, 29 U.S.C.A. § 160(e), that the decision of the Labor Board if adverse to an interested party, may be reviewed by the Court of Appeals of this Circuit, and of course possible further review by the Supreme Court of the United States on certiorari.

After a preliminary hearing on the pleadings and stipulation of counsel, an order was passed by this court which, in effect, was a restraining order against the Union pending a further and fuller hearing of counsel on the facts and law at a later date convenient for counsel. That postponed hearing occurred on October 10, 1957 when, in addition to what had previously been shown, there was further oral testimony in court by witnesses, and argument of counsel.

The more important and, I think, dominant facts so far appearing in the case are as follows: Mayco, Inc., a Maryland corporation engaged in the purchase and sale of milk in St. Marys and Calvert Counties, Maryland, filed a complaint with the Labor Board charging the respondent with having caused a secondary boycott at the places of business of Chestnut Farms and Embassy Dairies in the District of Columbia, in consequence of which the Mayco Co. was unable to purchase milk for transportation to its place of business, and distribution to its customers, including the Patuxent Naval Base. After preliminary investigation of this complaint and finding reasonable cause to believe that the alleged secondary boycott existed, the Labor Board filed its petition in this case.

Mayco Company employs about eleven drivers for its delivery trucks who are members of the respondent Union. Prior to August 1957 it had a labor contract with these employees, which expired on or about August 14, 1957. While Mayco

Co. and representatives of the Union were bargaining for terms of a new contract at Mayco's plant in St. Marys County, the Labor Union picketed that plant. When the Mayco Company sent drivers of its supply trucks to the places of business of Chestnut Farms and Embassy Dairies in Washington, D. C. they were first delayed and then refused the customary supplies of milk. The Labor Union established what was called a picket line, a picket standing on each side of the Mayco truck at the Chestnut Farms and Embassy Dairies with signs indicating that Mayco was being picketed. In addition representatives of the Union, including its business agent, informed the two dairies that they must not supply milk to the Mayco truck, and if they did all other employees of the dairy companies who were members of the Union, engaged in the handling and supplying of milk would be called out on strike. The two dairies at first disputed the right of the representatives of the Labor Union to give such an order and directed their employees to load the Mayco truck; but so many of the employees of the dairies would not load the trucks, that the dairies were obliged to discontinue deliveries to Mayco until the restraining order was signed, since which time the dairies have made customary deliveries to the Mayco Company.

The respondent Union has filed a motion to dsmiss the suit on the ground that it has not been filed in the proper venue district and that service has not been properly made on the Union. I have overruled these motions. The evidence shows that the Labor Union was transacting business in this district in the conduct of its negotiations for a wage contract by representatives of the Union in St. Marys County, and also in picketing the premises of Mayco in that County. The definition of the word "person" contained in the statute includes a labor union. The Marshal's return of service shows that it was served on Corneilius Jenkins, a vice-president of the Labor Union, at his residence in Silver Spring, Maryland. Rule 4(d) (3), Fed.Rules Civ.Proc., 28 U.S.C.A., and 29 U.S.C.A. § 185(d).

Counsel for the respondent Union challenges the venue on the ground that the secondary boycott in the instant case occurred in the District of Columbia. But this seems to the court immaterial because if the venue is, as I find, authorized by the statute, the nature of the equity jurisdiction in the matter of the interlocutory injunction acts in personam and is not necessarily limited to the district of the forum. Counsel for the respondent also states that the very great majority of the members of the Union are engaged in work in and about the District of Columbia, said to be over 2,000 in all, and argues that service on only one vice-president of the Union whose residence is in Maryland ought not to be regarded as binding on the Union as a whole. But I find the service was in accordance with the applicable rule and statute.

Another contention of counsel for the respondent is that as venue for the petition might have been laid in the District of Columbia where the Labor Union is also largely engaged in activities in transacting business, the selection of the Maryland district as the forum was unreasonable and oppressive to the Union on the ground, according to counsel's contention, that a recent decision in a majority opinion of the Court of Appeals for the District of Columbia in effect as construed by counsel would have determined that there was no real secondary boycott in this case. General Drivers, Chauffeurs, Warehousemen, etc. v. N. L. R. B., D.C.Cir., 247 F.2d 71. While I think the case might have been properly filed in the District of Columbia and while it might have been preferable to do so in this instance, I cannot think that that is a sufficient reason for this court to dismiss the case as the jurisdiction seems to have been acquired in due accordance with the statute. It is also fair to bear in mind that the damage here caused by the alleged secondary boycott directly affected Mayco's business in Maryland and, as shown by the evidence,

made it exceedingly difficult and costly for it to obtain, temporarily only, supplies from other dairies, and also in this case the petition is filed by the Regional Director of the Labor Board whose office is in Baltimore.

 Apart from the question as to venue and service, the only substantial contention of the respondent against the issuance of the interlocutory injunction is based on the legal point in the majority opinion of the District of Columbia Court of Appeals in General Drivers Union, etc., v. N. L. R. B. (American Iron Works Case), 247 F.2d 71. In that case the majority opinion was written by Circuit Judge Bastian, Circuit Judge Prettyman dissenting. Recently, on October 14, 1957, the Supreme Court has agreed to review the case on certiorari. 78 S.Ct. 42. Counsel also relies on a recent decision of the Second Circuit in Milk Drivers, etc. v. N. L. R. B. (the Crowley Case) 245 F.2d 817, certiorari pending, said to be to the same effect as the American Iron Works Case. See also Sales Drivers, etc. v. N. L. R. B. (Campbell Coal Case) 97 U.S.App.D.C. 173, 229 F.2d 514.

In both these cases the courts held that where the secondary employer had made a bargaining agreement with a Labor Union the latter would not be required to handle so-called "struck" goods (where the primary employer was under a labor strike). That agreement constituted a defense to the charge of a secondary boycott against the Labor Union. Or, as otherwise expressed, that such a contract insulated the Labor Union from the charge that it was conducting a secondary boycott. Such a clause in a labor contract has been called a "hot cargo" provision.

The point made by counsel for the respondent in this case is that it has such a hot cargo agreement between the Labor Union and the Chestnut Farms and Embassy Dairies. In support of this contention it has filed and relies on a provision in that contract, Art. XI, § 2, which reads as follows:

"2. There shall be no strikes, walkouts or lockouts during the life of this agreement. The Employer agrees that the members of this Union have the right to refuse to cross picket lines which have the approval of the Washington Teamsters Joint Council No. 55, affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America."

Counsel for the Labor Board contends that that quoted language does not amount to a so-called hot cargo agreement. And on comparison of the opinions in the two cases just referred to, I think the Board's contention is correct. The oral evidence in this case also tends strongly to support that view because it appeared that in the negotiations for the contract with Chestnut Farms and Embassy Dairies the Dairies declined to agree to a stipulation containing the so-called hot cargo embargo.

 Furthermore it must be apparent that the ultimate decision with respect to the validity of a hot cargo clause in a labor contract to insulate the Labor Union from the charge of a secondary boycott is a matter likely hereafter to be decided by the Supreme Court. And as bearing on the question of whether the Labor Board has made a sufficient showing for the issuance of an interlocutory injunction in this case, it must be noted that the Labor Board itself has heretofore decided in the Sand Door Case that the so-called hot cargo agreement is not a proper defense to a charge of secondary boycott; and in the Ninth Circuit case, N. L. R. B. v. Local 1976, United Brotherhood of Carpenters (Sand Door Case) 241 F.2d 147, that view of the Labor Board has been sustained and that case is also now pending on certiorari in the Supreme Court. See also N. L. R. B. v. Local 11, Carpenter's Union, 6 Cir., 242 F.2d 932, said not to be pending on certiorari.

With respect to the limited authority of this court regarding the petition in this case, it is also to be noted that the situation here is very similar to a like

petition for an interlocutory injunction which was issued by the District Court in New York and affirmed on appeal by the Second Circuit in the case of Douds v. Milk Drivers and Dairy Employees, Union Local 584, 248 F.2d 534, although the same Circuit had shortly theretofore decided the Crowley case, supra, sustaining the hot cargo provision. Despite that recent decision in the Second Circuit it nevertheless was found by the same Circuit in the last cited case (decided October 2, 1957) that the District Court rightly granted an interlocutory injunction on the petition of the Labor Board.

The language of the statute in 29 U.S.C.A. § 158(b) (4) (A) in defining what constitutes an unfair labor practice (popularly called a secondary boycott) reads:

"158 * * *

"(b) It shall be an unfair labor practice for a labor organization or its agents—* * *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;"

While this court does not have authority to pass ultimately on the question here involved in the contention of counsel for the respondent, it may be noted that the legal view sustaining the hot cargo provision in a labor contract seems to be largely based on the thought that the intention of Congress in defining what should constitute secondary boycott, was in effect to exempt a labor un-

ion from a charge of unfair labor practice where it had a "hot cargo" agreement with the secondary employer, and the view to the contrary has been well summarized by the concurring opinion of Circuit Judge Lumbard in the October 2, 1957 decision in the Doud case, supra, 248 F.2d 538, as follows:

"While concurring, I would have preferred that the question of union implementation of 'hot cargo' clauses be critically re-examined, as the decisions of this Court in Rabouin v. N. L. R. B., 2 Cir., 1952, 195 F.2d 906, and in Milk Drivers & Dairy Emp. v. N. L. R. B., 2 Cir., 1957, 245 F.2d 817, seem to me to be contrary to both plain statutory language and the intent of the Congress. See N. L. R. B. v. Local 1976, United Brotherhood of Carpenters and Joiners, 9 Cir., 1957, 241 F.2d 147; Alpert v. United Brotherhood of Carpenters and Joiners, D.C.Mass.1956, 143 F.Supp. 371; Douds v. Milk Drivers & Dairy Employees Local No. 680, D.C.N.J.1955, 133 F.Supp. 336; and Judge Levet's first opinion of June 13, 1957, in the cause now before this Court. See also N. L. R. B. v. Local 11, United Brotherhood of Carpenters and Joiners, 6 Cir., 1957, 242 F.2d 932. Contra: General Drivers, Chauffeurs, Warehousemen and Helpers Union, Local No. 886 v. N. L. R. B., D.C.Cir. 1957, 247 F.2d 71. If Congress intended to protect the public and, in the case of § 8(b) (4) (B) of the Labor Management Relations Act of 1947, primary employers, from the effect of secondary boycotts, and I believe it did so intend, other parties cannot insulate themselves by contract from such statutory prohibitions."

I conclude, therefore, that whether or not the hot cargo provision is effective to insulate the Labor Union on the charge of secondary boycott is still at least an entirely open question for ultimate decision by the Supreme Court, and that in the instant case I think there is at least a material and important difference in

the provisions herein relied on by counsel for the respondent and the provisions held to constitute a hot cargo as explained in the District of Columbia and Second Circuit cases, to wit, American Iron Works and the Crowley case.

For all these reasons I therefore conclude that there is reasonable cause in this case to believe that the respondent has conducted an unlawful secondary boycott and that the interlocutory injunction should issue as prayed for.

I add, however, that it is quite possible that pending the decision of the Labor Board in this particular case which it is thought by counsel in due course will probably be rendered in about six months, there may be a more determinative opinion of the Supreme Court upon the subject. In that event, and if the decision made should be to the effect that there was no secondary boycott existing on the evidence in this case, leave should be given to the respondent promptly thereafter to move for further consideration and possible vacation of the interlocutory injunction.