Charles T. DOUDS, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

MILK DRIVERS AND DAIRY EMPLOYEES UNION LOCAL 584, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO, Respondent.

United States District Court
S. D. New York.
June 13, 1957.

On Rehearing June 27, 1957.

Affirmed Oct. 2, 1957.
See 248 F.2d 534.

The petitioner, who is Regional Director of the Second Region of the National Labor Relations Board, alleges that the respondent is a labor organization within the meaning of Sections 2(5), 8(b) and 10(*l*) of the National Labor Relations Act, 29 U.S.C.A. 141 et seq., and has its principal office in this judicial district and is engaged here in transacting business and in promoting and protecting the interest of its employee members.

The petition further alleges that on or about May 29, 1957, Chesterfield Farms, Inc. a so-called Class B milk distributor, on behalf of itself and seven other Class B milk distributors, filed a charge with the Board alleging that the respondent was engaging in unfair labor practices within the meaning of Section 8(b), subsections (4) (A) and (B) of the Act, and that on or about June 4, 1957, the Home Milk Delivery Association (hereinafter also called Home Milk Deliverers), an association of Class C milk dealers, filed a charge with the Board alleging that the respondent has engaged in and is engaging in unfair labor practices within the meaning of the said section of the Act.

It is further stated in the petition that the charges were referred to the petitioner for investigation and were investigated by the petitioner and under his supervision. Petitioner states and alleges that there is reasonable cause to believe that the said charges are true and that a complaint of the Board based thereon should issue against the respondent pursuant to Section 10(b) of the Act. The petition sets forth the acts and conduct which are, it is alleged, violations of the said Act. These alleged violations are in effect as follows:

1. Certain Class B dealers consisting of Chesterfield Farms, Inc., Whitestone Farms, Inc., Columbia Farms, Inc., York Creameries, Inc., Broadlea Dairies, Inc., Pine Crest Farms, Inc., Maplewood Farms, Inc., and Lakewood Farms, Inc., are engaged in the sale and distribution of milk, primarily to home deliverers, known as Class C dealers. All of

Sidney D. Goldberg, Washington, D. C., and Harold L. Richman, New York City, for petitioner.

Samuel J. Cohen, New York City, for respondent.

Weil, Gotshal & Manges, New York City, for Chesterfield Farms, Inc. and other B dealers constituting charging parties. Milton Haselkorn, New York City, of counsel.

Weisman, Allan, Spett & Sheinberg, New York City, for Home Delivery Association, Inc., one of the charging parties. David Jaffe, New York City, of counsel.

LEVET, District Judge.

This is an application for a temporary injunction to enjoin and restrain the respondent, its officers, agents, representatives, servants, employees, attorneys, etc. from certain acts hereinafter mentioned.

the employers referred to above are signatories to the Milk Industry Collective Bargaining Agreement.

2. During the month of April, 1957, fluid milk for human consumption valued at approximately $14,000,000 was brought to the milk pasteurizing and bottling plants of employers, known as Class A dealers, from the New York milkshed which comprises the states of New York, Pennsylvania, New Jersey, Vermont and New Hampshire. Of this $14,000,000, approximately $3,500,000 in fluid milk was brought to New York City from the states of Pennsylvania, New Jersey and Vermont.

3. Home Milk Deliverers consists of about 40 of the approximately 350 home delivery dealers in the City of New York. These dealers are licensed by the State and City of New York as Class C dealers. Under such license each Class C dealer is restricted to a single home delivery route and to the use of a single truck. Approximately 600,000 people in the City of New York are serviced at their homes by Class C dealers.

4. Respondent has as members and represents the employees of employers, including Class A and Class B dealers, who are signatories of the Milk Industry Collective Bargaining Agreement.

5. A substantial number of Class C dealers employ drivers and helpers in connection with the operation of their home delivery routes. Since on or about May 8, 1957, respondent has demanded that those Class C dealers who have employees sign a contract with it covering the drivers employed by said Class C dealers. At no time material herein has respondent been certified by the Board as the collective bargaining representative for the employees of Class C dealers.

6. Since on or about May 8, 1957, respondent, in furtherance of its said demand in paragraph 5 hereof, has engaged in, and by picketing, orders, appeals, instructions and other means, has induced and encouraged the employees of Sunshine Farms, Inc., Gold Medal Farms, Inc., and of other Class A deal-

ers, of Chesterfield Farms, Inc., Whitestone Farms, Inc., and of other Class B dealers, to engage in strikes or concerted refusals in the course of their employment to use, handle, transport, load, unload, store or otherwise work on goods, products or commodities or to perform services.

7. Objects of respondent's acts and conduct set forth in paragraph 6 hereof are: (a) to force or require Sunshine Farms, Gold Medal Farms, Chesterfield Farms, Whitestone Farms and other Class A and Class B dealers, to cease doing business with members of Home Milk Deliverers and other Class C dealers, and with each other; and (b) to force or require the Class C dealers to recognize and bargain with respondent as the representative of their employees although not certified as such under the provisions of Section 9 of the Act.

8. As a result of respondent's activities set forth in paragraph 6 hereof, none of the Class C dealers at Chesterfield Farms was able to obtain milk for its customers on June 5, 1957; 12 of the 27 Class C dealers at Whitestone Farms, Inc. were unable to obtain milk and that, as a result thereof, upon information and belief, more than 100,000 consumers did not receive home delivery of milk on June 5, 1957.

9. Upon information and belief, unless restrained, there is imminent danger that substantial and irreparable injury will unavoidably result to the Class A, B and C dealers and to the general public.

10. That it may be fairly anticipated that unless restrained, respondent will continue and repeat its acts and conduct hereinabove set forth, or similar or like conduct in violation of Section 8(b), subsections (4) (A) and (B) of the Act. That to avoid the serious consequences referred to above, it is essential, appropriate and in accordance with the provisions of Section 10(l) thereof, that, pending the final disposition by the Board of these matters, respondent be enjoined and restrained from the commission of

the acts and conduct above alleged, similar acts and conduct, or repetition thereof.

The petitioner contends that the acts complained of violate Section 8(b), subsections (4) (A) and (B) of the Act, 29 U.S.C.A. § 158(b) (4) (A) and (B). This section is as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; (B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title; \* \* \* "

The petitioner further states that the court is authorized and permitted to grant the relief sought for under Section 10(*l*) of the Act, 29 U.S.C.A. § 160(*l*), which reads in part as follows:

"(*l*) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 158(b) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: \* \* \* "

Now, after hearing the petitioner's counsel, counsel for the charging parties, and counsel for the respondent, and after the presentation of all relevant testimony submitted, and for the purposes of this motion only, I find that the essential elements of the allegations of the petition heretofore stated by me have been sustained and in addition and in amplification thereof I find as follows:

### Findings of Fact

1. Certain dealers, to wit, Chesterfield Farms, Inc., Whitestone Farms, Inc., Columbia Farms, Inc., York Creameries, Inc., Broadlea Dairies, Inc., Pine Crest Farms, Inc., Maplewood Farms, Inc., and Lakewood Farms, Inc., are engaged in the sale and distribution of milk primarily to home deliverers. Chesterfield and Whitestone have their place of business in the County of The Bronx, New York, and the remaining dealers above mentioned have their businesses in the County of Kings, City and State of New York. These dealers are known as Class B dealers.

2. Another group of dealers is known as Class C dealers. These dealers are engaged as home deliverers in the sale and distribution of milk of the aforesaid Class B dealers in the County of The Bronx and elsewhere in the City of New York under certain licenses whereby such dealers are each restricted to a single home delivery route and the use of a single truck.

3. The Class B dealers above mentioned are all signatories to a certain Milk Industry Collective Bargaining Agreement, a copy of which was marked in evidence as Exhibit 2 in this proceeding. In the month of April, 1957, fluid milk for human consumption valued at approximately $14,000,000 was brought to milk pasteurizing and bottling plants of certain employers known as Class B dealers from the New York milkshed which comprises the states of New York, Pennsylvania, New Jersey, Vermont and New Hampshire, of which $14,000,000 approximately $3,500,000 in value in fluid milk was brought to the City of New York from the states of Pennsylvania, New Jersey and Vermont.

4. Respondent's members include employees of employers, including Class A dealers, who bottle and pasteurize milk for the Class B dealers above mentioned, and the employees of the Class B dealers, both of which dealer groups are signatories to the said Milk Industry Collective Bargaining Agreement.

5. Certain members of the Class C dealers above mentioned employ drivers and helpers in connection with the operation of their respective home delivery routes. Since on or about May 8, 1957, respondent has demanded that said Class C dealers who have employees sign a contract with the respondent covering the drivers employed by the said Class C dealers, although at no time mentioned herein has the respondent been certified by the Board as the collective bargaining representative for the employees of Class C dealers.

6. The respondent-union conceded that its members working for employers under the Milk Industry Collective Bargaining Contract—that is, particularly Class B dealers—declined to handle material and milk products destined to Class C dealer employers and with respect to certain Class B dealers and that the union so instructed and advised its employees.

7. The Class A dealers are receivers of milk from farms and other sources, which milk is bottled and pasteurized and sold to Class B distributors. The Class B distributors sell to the licensed Class C distributors, who are individual routemen permitted by regulations to own only one truck and have only one route.

8. About 40 such Class C dealers are attached to Chesterfield Farms, Inc., having an organization known as Home Milk Delivery Association. On May 17, 1957, one Ignatius Canavan, vice president of the respondent-union, asserted to Carl Littman, secretary and treasurer of Chesterfield Farms, Inc., that all the Class C dealers must be organized and that thereafter none but the C dealers themselves were to come to the platform to get milk unless he, Canavan, permitted them to do so. Thereafter, on or about June 3, 1947, Canavan told Littman that Canavan was not going to permit Chesterfield employees to load the trucks of C dealers and that if the C dealers loaded thereafter there would be trouble. Littman refused to accede to this procedure, stating he would have to remain in business, that the trucks of the C dealers would be loaded even if the C dealers themselves did the loading. Furthermore, Canavan stated to Littman that he would prevent Sunshine Farms, a Class A dealer, from bottling milk the next night for Chesterfield. Although Littman informed Canavan that he felt Canavan's declaration of intention, if carried out, would violate the law, Canavan said it would be done nevertheless. Thereafter, on June 3, 1957, at approximately 7:00 to 7:30 P.M., a picket was posted in front of the premises of Chesterfield Farms. The sign carried by such picket read: "Join Milk Drivers and Dairy Employees Union, Local 584.

IBT of AFL." On that same sign was appended a typewritten sheet listing the names of 36 C dealers and their license numbers, being the C dealers who were customers of Chesterfield Farms. The other sign carried by the picket read: "Employees of C Dealers—Join Milk Drivers and Dairy Employees Union, Local 584, affiliated with International Brotherhood of Teamsters." Although on June 3, 1957, milk bottled by Sunshine Farms for Chesterfield Farms had already been processed and was on trailers nearby, from which Chesterfield was able to obtain it for the C dealers, on the following day, June 4, 1957, Chesterfield did not obtain milk from Sunshine for Chesterfield's C dealers.

9. On the evening of June 5, 1957, at approximately 10:15, Littman observed Canavan being served with a temporary restraining order issued by this court and heard Canavan tell Brunetti, the union shop steward, to "resume bottling."

10. The sole business of Chesterfield is purchasing milk from Sunshine and selling it to the 40 C dealers.

11. If the said C dealers do not obtain their milk for even a few days their routes will disappear and the business of the C dealers and their supplier, the B dealer, Chesterfield and others, will be irreparably damaged and probably destroyed.

12. Sunshine Farms, a subsidiary of the Borden Company, is an A dealer in milk, obtaining it from farms and other sources, some outside the State of New York. It bottles this milk and sells a substantial portion to Chesterfield, a B dealer, who is nearby. Sunshine has approximately 50 to 60 employees, practically all of whom are members of the respondent-union. The company has the same collective bargaining agreement with this union heretofore mentioned.

13. On the 3rd day of June, 1957, at approximately 7:00 P.M., Ignatius Canavan, vice president of the respondent-union, told Richard Johnson, plant manager of Sunshine Farms, Inc., (Class A dealer) and one Brunetti, an employee of and union steward at Sunshine Farms, that Sunshine was not to bottle milk for Chesterfield (Class B dealer) because "Chesterfield had a dispute with some C dealers buying from Chesterfield." After Johnson consulted his superiors he acquiesced in the union's instruction and thereafter that evening no milk was bottled for Chesterfield. When Johnson inquired of Canavan what would happen if the employees, in spite of his instruction, bottled the milk for Chesterfield, Canavan said the employees would be taken out. Chesterfield purchases from Sunshine approximately 30,000 quarts of milk a day.

14. Some time in May, 1957, Canavan passed out certain leaflets in the area and told one Max Channing, a member of the respondent-union, employed by Chesterfield as a foreman, that none but the C dealers themselves would be permitted to pull out a loaded truck, contrary to the former practice which permitted either the C dealer or his employee to do so, and that the C dealers were not to be permitted to ice their trucks or load byproducts as formerly done.

15. Certain C dealers, including one Edward Weinstock, on or about May 9, 1957, received a letter from the union dated May 8, 1957, reading as follows:

"Dear Sir:

"This Union represents your driver. Kindly call at the union office for the purpose of negotiating a contract.

"Unless we hear from you within five days, the Union will take such action as may be appropriate without further notice."

16. After receiving this letter, Weinstock, the said C dealer, met Canavan and asked him what the union wanted and Canavan replied in effect that it wanted a straight union contract. Unless Weinstock signed such a contract he would not be able to operate. Later in May or the beginning of June, 1957, Weinstock again met Canavan and Canavan said that if Weinstock sent his employee

to pick up his truck his supply would be stopped.

17. Early in May, 1957, Canavan told one Joseph Margiasso, employed by Chesterfield as a utilityman, and a member of Local 584, and other employees, that he, Canavan, wanted them not to load the trucks of C dealers unless the owner himself, and only the owner, was on the truck.

18. On June 5, 1957, at 2:30 A.M., Canavan, at the platform of Chesterfield, told Max Channing, the foreman of Chesterfield, that he, Canavan, had given strict orders that no milk of any C dealer was to be taken out of the Chesterfield refrigerator even though it had been paid for and that Channing should make certain that no other fellows on the platform loaded any milk for any C dealer unless Canavan told him to.

19. Certain of the C dealers asked Canavan to revoke his orders. Canavan refused to order a disregard of his previous instructions unless the C dealers signed contracts with the union, and although the C dealers told Canavan that if they did not get milk they would be out of business, he said it was none of his concern—"Sign and you will get your milk."

20. Whitestone Farms, a B dealer, is located at East 156 Street, The Bronx, New York, three blocks East of Bruckner Boulevard. Gold Medal Farms, an A dealer, from which Whitestone obtains its milk, is located nearby. Whitestone has 28 Class C dealers, serving some 20,000 to 25,000 customers in the Boroughs of The Bronx and Brooklyn. On each day at about 1:00 P.M. Raymond Luchansky, a C dealer, brings his truck in to Whitestone Farms, leaves it and returns at 3:00 the following morning, at which time he finds his truck loaded with milk to serve his customers. He employs one full-time helper. On or about May 8 or 9, 1957, he received a letter similar to the one referred to above. On Tuesday, June 4, 1957, at approximately 3:00 A.M., when he went to the Whitestone plant, he saw a picket at the entrance carrying a placard which said substantially: "C Dealers Employees, Join Local 584," and under this was a long list containing the names of the C dealers who purchased from Whitestone. At 6:00 o'clock that evening he found the picket still there. A short distance away on 156th Street he saw John Sopinko and Ignatius Canavan, officers of the respondent-union, talking to a group of C dealers, to whom Canavan said a number of times that if the C dealers did not sign contracts with the union they would not get any milk and when certain of the C dealers asked Canavan for an opportunity to read the contract and to consult an attorney, if desired, he said, "You will read the contract after you sign it. If you do not sign it, you will get no milk." The union leaders had a number of printed documents similar to the contracts submitted in evidence (Exhibit 2). Some 10 or 15 of the C dealers took copies of the contract and signed them and read them afterwards; thereafter Canavan said to Sopinko, "It's O. K. to load Route No." and then he added a number. Those who did not sign contracts were not able to get a loaded truck that night and were not able to deliver to customers on June 5, 1957.

21. On June 4, 1957, one Joseph Cappelli, a C dealer who purchases milk from Whitestone, was outside the Gold Medal and Whitestone plants and one Fromm, manager of the Gold Medal plant, asked Canavan what would happen if Cappelli were given milk and Canavan said in that event he would pull out the Gold Medal employees. Cappelli signed no contract and got no milk.

22. The same or a similar pattern was followed at the Gold Medal (A dealer)—Whitestone (B dealer) area, and the Heggeman Farms (A dealer) and Maplewood Farms and Lakewood Farms (B dealers), where there are some 22 C dealers. The occurrences were also similar at the following B dealers: Columbia Farms, Inc., York Creameries, Inc., Pine Crest Farms, Inc., Broadlea Dairies, Inc. and their respective A dealers and C

dealers, such occurrences being generally similar to those at Sunshine and Chesterfield, as aforesaid.

23. On June 4, 1957, Sunshine Farms sent the following telegram to the union:

"John Kelly, President

"International Brotherhood of Teamsters Local 584

"265 West 14th Street, New York, N. Y.

"Our telegram May 29th to you denied knowledge labor dispute between your Union and Chesterfield Farms stop We urged you not invoke Paragraph eighteen of Milk Industry collective bargaining agreement and invited discussion stop

"Your only response to date was visit to our plant last night at which your representatives directed our employees not to process milk for sale to Chesterfield stop We deem your action improper and request immediate arbitration under Paragraph twenty three whether Paragraph eighteen permits you under existing circumstances to forbid our employees to process such milk stop

"We expect you will immediately countermand your instructions to our employees and not renew them pending arbitration.

"James O'Keefe
    Sunshine Farms, Inc.

"Copy to U. S. Conciliation and Mediation Service"

On June 5, 1957, the union responded thereto, as follows:

"Sunshine Farms, Inc.

"161st Street and Exterior Street

"Bronx, N. Y.

"Receipt of your telegram of June 4 is acknowledged. The union is engaged in a labor dispute with Chesterfield Farms and other milk dealers by reason of their manipulation of C dealers and non union helpers for the purpose of evasion of contract wages and conditions. The union will arbitrate in accordance with the contract at any time but since its ac-

tions are entirely proper will not countermand its instructions pending arbitration.

"Milk Drivers & Dairy Employees Union Local #584

"265 West 14th Street

"New York City"

24. No C dealers have ever received milk deliveries by truck from B dealers, nor do B dealers pick up anything by truck from C dealers, and under normal conditions approximately half of the loading and unloading operations on the B dealers' platforms are done by and performed by B dealer employees and approximately one-half of such operations are performed only by C dealers or their employees, varying from barn to barn (that is, the places of business of the B dealers). The cases and bottles containing the milk are always the property of B dealers.

25. The respondent-union, together with four other local unions in the Metropolitan Area of New York City, is a party to a collective bargaining agreement known as the Milk Industry Collective Bargaining Agreement, providing a uniform wage scale and working conditions applicable to some 12,000 dairy employees in the area. Class A and Class B dealers concerned in this matter are parties to the contract above referred to.

26. Since on or about May 8, 1957, the respondent has demanded that Class C dealers who have employees sign a contract with it covering the drivers employed.

27. The union has advised its member employees working for B dealers to decline to handle milk destined to C dealers. Chesterfield and Whitestone were notified by respondent of its alleged dispute with such C dealers. This notice read: "In accordance with Paragraph 18 on page 3 of the Collective Bargaining Agreement, we are hereby informing you of the existence of a labor dispute with" and then mentions various C dealers. Such notice was given at least 48 hours before the union instructed its members with respect to handling milk products.

28. Chesterfield and Whitestone insisted that their employees handle the products destined for such C dealers despite respondent's notice, and the respondent notified Sunshine and Gold Medal (A dealers) of such dispute with Chesterfield and Whitestone on or about May 28th, as follows:

"In accordance with Paragraph 18 on page 3 of the Collective Bargaining Agreement, we are hereby informing you of the existence of a labor dispute with Chesterfield Farms, Inc.

"Very truly yours,"
(signed by Local 584)

29. There was some testimony offered to the effect that one of the B dealers, to wit, Broadlea Dairies, was financially interested as an actual assignee in some of the C dealer licenses in certain instances. However, there was no proof that all such licenses were controlled by Broadlea Dairies. Approximately 36 C dealers operate with milk obtained from Broadlea. There was no contention that all of the C dealers of Broadlea were so controlled.

30. On the early morning of June 5, 1957, Canavan, for the respondent, told certain C dealers that the contract presented was the only contract available and it was a question of signing it and getting the milk, and in effect that this applied to C dealers who had no helpers; that such dealers would have to sign contracts or they would not go out with milk. No C dealer got milk from Chesterfield that morning. Only one C dealer with Chesterfield signed the contract.

31. It has been shown that the union induced employees of B dealers to refuse to perform services in connection with the supplying of milk to C dealers connected with various B dealers mentioned herein and one of the objects of the union in so ordering such members was to require their respective employers to cease doing business with other C dealer employers or to require the C dealer employers to recognize a bargaining agreement with the union, although said union was not certified under the Act as the representative of such C dealer employees. The union also sought in a similar way to force or require A dealers to stop doing business with B dealers.

32. Out of some 300 C dealers concerned herein, some 57, after the commencement of respondent's efforts, signed uniform collective bargaining contracts with the respondent, attached to which contracts are certain employee applications for union membership. In seeking to unionize employees of C dealers the union solicited membership by distributing circulars, claiming benefits of union membership and by stating that milk supplies would be withheld by the union. The contracts signed by the C dealers were signed only after the C dealers were told by the union that the milk supply would be withheld, i. e., as, in effect conceded by the union, by economic pressure.

33. There was no direct dispute between the union and the B dealers; the dispute with B dealers was based upon such B dealers continuing to sell to C dealers.

34. The harm threatened to the B and C dealers is and would be, in my opinion, irreparable, while the damage, if any, to the union by reason of the denial of the ultimate relief sought is by comparison limited.

### Discussion

The basic issue before the court is whether or not secondary picketing as proscribed by Section 8(b) (4) (A) and (B) of the National Labor Relations Act, as amended, is permissible by reason of the so-called "hot cargo" clause in the respondent-union's contracts (Paragraph 18(c) and (d)) with the secondary employers. Paragraph 18(c) and (d) of the contract reads as follows:

"(c) It shall not be a violation of this Agreement or cause for discharge for any member of the Union to refuse to make deliveries or pickups of goods, to or from any customer or third party, if such customer or third person is directly in-

volved in a controversy with any Union under the jurisdiction of the American Federation of Labor and if pickets are situated at the location where the delivery or pickup is to be made. If the customer or third person is not directly involved in a controversy with any union under the jurisdiction of the American Federation of Labor and if pickets are situated at the location, the members of the Union shall make deliveries to or pickups from such customers or third person for at least 48 hours after the Union has discussed the situation with the Employer; if the Employer, any of its divisions, subsidiaries or affiliates are directly or indirectly involved in a controversy with any Union, the members of the Union shall make deliveries or pickups for at least 48 hours after the Union has discussed the situation with the Employer; thereafter it shall not be a violation of this Agreement for failure to make deliveries or pickups, but the Employer reserves any and all rights it may have, except any rights based on a contractual claim for such failure.

"(d) It shall not be a violation of this Agreement for members of the Union to refuse to handle material in the possession of the Employer received from any employer with whom Local 338, or Local 584, or Local 602, or Local 607, or Local 680 is directly engaged in a labor dispute, provided such material comes into the Employer's possession more than 48 hours after the Union gives written notice to the Employer of the existence of such labor dispute. It shall not be a violation of this Agreement for the members of the Union to refuse to make deliveries to or pickups from any employer with whom Local 338, Local 584, or Local 602, or Local 607, or Local 680 is directly engaged in a labor dispute, provided such refusal occurs more than 48 hours after the Union has given written notice to the Employer of the existence of such labor dispute."

It is clear that in the absence of such a clause a labor union would engage in an unfair labor practice within the meaning of the Act when, by peaceful picketing, the union induces employees of a secondary employer to engage in a strike in the course of their employment, where an object of such inducement is to force the secondary employer to terminate its dealings with a primary employer with whom the union has a dispute. National Labor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; International Brotherhood of Electrical Workers, Local 501, A. F. of L. v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299; Local 74, United Brotherhood of Carpenters & Joiners of America, A. F. of L. v. National Labor Relations Board, 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309.

The respondent-union contends that the "hot cargo" clause above cited justifies urging employees of the Class B dealers not to handle or make "deliveries" or "pickups" of milk destined for Class C dealers who have refused to sign contracts recognizing the union as the bargaining representative for their employees. Moreover, the respondent-union asserts that the hot cargo clause also permits it to induce members employed by the Class A dealers to strike in the event that the Class A dealers ship milk to those Class B dealers which refuse to cease doing business with unsigned Class C dealers.

The respondent-union in support of its position relies on Rabouin v. National Labor Relations Board, 2 Cir., 1952, 195 F.2d 906. In the Rabouin case, the National Labor Relations Board contended, inter alia, that a union's pressure on neutral employers to stop accepting shipments from Henry Rabouin, d/b/a Conway's Express, because he employed nonunion truck drivers was violation of Section 8(b) (4) (A). After stating

that the union did not encourage the *employees* of the neutral employers to engage in a strike or concerted refusal to handle Rabouin's shipments, Judge Clark said:

"The union cannot have committed an unfair labor practice under this section in regard to those *employers* who refused to handle Rabouin's shipments under the terms of the area agreement provision relating to cargo shipped by struck employers. Consent in advance to honor a hot cargo clause is not the product of the union's 'forcing or requiring any employer * * * to cease doing business with any other person.' § 8(b) (4) (A)." (Emphasis added) At page 912.

In General Drivers, Chauffeurs, Warehousemen and Helpers Union, Local No. 886, AFL-CIO v. National Labor Relations Board, D.C.Cir., 247 F.2d 71, Judge Bastian of the Court of Appeals for the District of Columbia referred to the Rabouin case, supra, with approval and held that a hot cargo clause may be used as an excuse by a union on strike to induce employees of a secondary employer to refuse to handle the struck goods of a primary employer. The thinking on which this holding seems to be fashioned was that since an employer may lawfully agree that his employees will not be required to handle freight from a struck company, it should follow that a union's conduct in urging the employees to refrain from doing what their employer had agreed in advance not to do was likewise not unlawful and did not constitute a strike. However, Judge Prettyman, in his dissent, answered this point as follows:

"I dissent from Judge Bastian's opinion and proposed judgment in No. 13394, relating to the Teamsters. In a nutshell my view is that the hot cargo clause cannot be enforced by a strike, because such a strike or refusal to work is flatly forbidden by Section 8(b) (4) (A) of the Act.

\*    \*    \*    \*    \*

"It follows from the foregoing that, if an employer and his employees agree by contract that the employees need not handle certain goods, and both abide by their agreement, there is no 'strike' or 'refusal to work'. But, if an employer, having entered into such a contract, thereafter refuses to abide by his agreement and directs his employees to handle the goods, and his employees refuse to do so, there is a strike or refusal to work. Such a strike or refusal to work, where an object is to force the employer to cease transporting the products of another producer, is forbidden by the statute."

The Rabouin case, supra, however, does not support the respondent-union's claim that it is now established law in the Second Circuit that a union may induce the employees of a signatory to a contract containing a hot cargo clause to refuse to handle the struck goods of a primary employer. On the contrary, Chief Judge Clark in National Labor Relations Board v. Associated Musicians of Greater New York, Local 802, American Federation of Musicians, AFL, 2 Cir., 1955, 226 F.2d 900, certiorari denied 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483, indicated that the Rabouin case should be limited to situations involving union activities directed to secondary employers rather than to their employees.

"Respondents also claim that their activities were directed to secondary employers, and not to employees, and were therefore not illegal. See Rabouin v. N. L. R. B., supra, 2 Cir., 195 F.2d 906, 911–912. But as we have already pointed out, the Board was justified in finding that the picketing at the Stadium and the Rink was in part at least intended to influence employees at those locations.

"The petition for enforcement of the Board's order is granted." 226 F.2d at page 907.

In another case in the Second Circuit, Judge Lumbard said:

" * * * We have held that requests and threats addressed directly to secondary employers are not illegal, Rabouin v. N. L. R. B., 2 Cir., 1952, 195 F.2d 906, 911, 912; see N. L. R. B. v. Associated Musicians of Greater New York, Local 802, 2 Cir., 226 F.2d 900; and we have indicated that solicitation of customers of secondary employers is also lawful. See N. L. R. B. v. Service Trade, Chauffeurs, Salesmen, and Helpers, Local 145, 2 Cir., 191 F.2d 65, at page 68. The only thing proscribed by § 8(b) (4) is inducement or encouragement of the employees of customers." National Labor Relations Board v. Business Machine and Office Appliance Mechanics Conference Board, Local 459, etc., 2 Cir., 1955, 228 F.2d 553, 559, certiorari denied 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483.

Although the National Labor Relations Board supported the validity of a hot cargo clause in the Rabouin case, 87 N.L.R.B. 972, it subsequently altered its view and now holds that an employer's acquiescence does not exonerate the union activities from the ban aimed at inducing employees to refuse to handle the goods of another employer as proscribed by Section 8(b) (4) (A). Sand Door & Plywood Co., 113 N.L.R.B. 1210. Similarly, in American Iron and Machine Works Company, 115 N.L.R.B. 800, the Board concluded that while Section 8(b) (4) (A) does not forbid the execution of a hot cargo clause or a union's enforcement thereof by appeals to the employer to honor his contract, the Act does preclude enforcement of such clause by appeals to employees, irrespective of the employer's acquiescence in the union's demand that the employees refuse to handle the struck goods. See also Crowley's Milk Company, 116 N.L.R.B. 1408.

In two recent cases, National Labor Relations Board v. Local 11, United Brotherhood of Carpenters & Joiners of America, etc., 6 Cir., 1957, 242 F.2d 932, and National Labor Relations Board v. Local 1976, United Brotherhood of Carpenters and Joiners of America, etc., 9 Cir., 1957, 241 F.2d 147, the Sixth and Ninth Circuits respectively adopted the Board's present position. In the Local 11 case, supra, the court observed:

"Without question the respondents are correct in their assertion that there is nothing in § 8(b) (4) (A) of the Act which makes it an unfair labor practice for a union to appeal directly to an *employer* to induce him to cease doing business with another employer. Rabouin v. N. L. R. B., 2 Cir., 1952, 195 F.2d 906, 912; see Schatte v. International Alliance, 9 Cir., 1950, 182 F.2d 158, 165. In the present case, however, the Board found that the respondents had induced and encouraged *employees* not to handle or work on the doors in question and an examination of the record discloses that the findings of the Board that respondents have engaged in such conduct are supported by substantial evidence.

* * * * *

"Confining our decision to the facts of the case before us we hold that the Board was correct in finding that a violation of the act was not precluded by the fact that the subcontractors as union members were obligated to observe union working rules. All the elements of a § 8(b) (4) (A) violation having been found upon substantial evidence—inducement, refusal and unlawful objective—the acquiescence of the subcontractors could not serve to immunize respondent's conduct from the operation of the statute, enacted for the protection of the public as well as for the protection of neutral employers * * *." 242 F.2d at pages 935, 936.

The importance of protecting the interests of the members of the public who are not parties to the hot cargo contract was graphically expressed by a New Jersey District Court in Douds v. Milk

**234**

Drivers and Dairy Employees Local No. 680, D.C.N.J.1955, 133 F.Supp. 336, as follows:

> " * * * Indeed it is difficult to see how a contract between an employer and his employees can affect the rights of the public, who are not a party to such contract. The natural and reasonable construction of the 'hot cargo' clause would seem to be, that it affects only the rights of the parties thereto. Specifically, that in exempting the employees from the duty to handle the products of an employer in the midst of a labor dispute, the clause simply means that this right of the employees exempts them from being dsimissed by their employer, should they disobey his orders to handle such products. But this protection of the employees, arising from the 'hot cargo' clause, in no wise affects or diminishes the protection which the Taft-Hartley Act has thrown about the public, in proscribing unfair labor practices in the form of the secondary boycott alluded to in Section 8. * * * " At page 341.

By reason of the view which I have taken with respect to the lack of any protective cloak accruing to the union through its invocation of the hot cargo clause, I have not deemed it necessary to consider whether under the facts of this case the charging parties are correct or incorrect in their contention that such clause is not germane here.

■ The issuance of injunctions against unfair labor practices on petition of the National Labor Relations Board is designed to authorize speedy relief in cases where unfair labor practices threaten serious harm which may be irremediable under ordinary procedures provided under the statute. See Douds v. Wine, Liquor & Distillery Workers Union, Local 1, D.C.S.D.N.Y., 1948, 75 F.Supp. 447. Even where grave and difficult questions of law are involved and where an answer might disclose disputed issues of fact, preliminary injunctions against enforcement of the statute pending final hearing will be granted where injury to the plaintiffs would be certain and irreparable if the application were denied, while granting of the application would not seriously damage and inconvenience defendants. See Independent Workers of Clayton Mark & Co. v. Beman, D.C.N.D.Ill., 1936, 13 F.Supp. 627.

■ There is an adequate basis for the Board's finding that there was reasonable cause to believe that the charges filed here are true. It is settled law that no more is required on this phase of the case. Douds v. International Longshoremen's Association, 2 Cir., 1957, 242 F.2d 808, 810.

It is the opinion of this court that the respondent-union's activities appear to be contrary to the provisions of Section 8(b) (4) (A) and (B) in spite of the hot cargo clause here involved. Consequently, the injunctive relief sought by the Board is granted. Since the 57 contracts signed by C dealers with the union were obtained by economic pressure by the union on the C dealer employees and before certification, the preliminary injunction will include a provision to stay enforcement of such contracts pending hearing and determination of this matter before the Board.

### Conclusions of Law

1. The court has jurisdiction of the subject matter and the parties herein.

2. There is reasonable cause to believe that the respondent-union has engaged in and threatens to continue to engage in unfair labor practices in violation of Section 8(b) (4) (A) and (B) of the National Labor Relations Act.

3. The petitioner is entitled to a temporary injunction pursuant to Section 10(*l*) of the Act.

Settle order on notice.

### On Rehearing.

In view of the decision by the Court of Appeals, Second Circuit, on June 19, 1957, in Milk Drivers and Dairy Employees Local Union No. 338, International Brotherhood of Teamsters,

Chauffeurs, Warehousemen & Helpers of America, AFL-CIO v. National Labor Relations Board (Milk Drivers and Dairy Employees Local Union No. 680, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL-CIO v. National Labor Relations Board), 245 F.2d 817 this court, on its own motion, requested a reargument of petitioner's application for a temporary injunction. Said application for temporary injunction was granted pursuant to a decision of this court on June 13, 1957, wherein it was stated that by reason of the view taken by the court with respect to the "hot cargo" clause it was unnecessary to consider the applicability of the clause under the facts in this case.

■■ In its decision dated June 19, 1957, in reversing the orders of the National Labor Relations Board in the Crowley case, 116 N.L.R.B. No. 195, the Court of Appeals held that a union's concerted action in encouraging the employees of a secondary employer (Crowley's distributors) to refuse to handle goods of a primary employer (Crowley) with whom it had a labor dispute, was not violative of Section 8(b) (4) (A) and (B) of the Labor Management Relations Act of 1947 where the secondary employer (Crowley's distributors) had agreed in advance under the terms of a "hot cargo" clause not to handle strikebound goods. Consequently, it is now incumbent upon this court to determine whether or not there are reasonable grounds to support the National Labor Relations Board's contention that the "hot cargo" clause upon which the union relies in this case is inapplicable.

The facts as heretofore found by this court are incorporated in and are to be deemed a part of this decision.

The so-called "hot cargo" clause contained in the union's contracts with the A and B milk dealers reads as follows:

"(c) It shall not be a violation of this Agreement or cause for discharge for any member of the Union to refuse to make deliveries or pickups of goods, to or from any customer or third party, if such customer or third person is directly involved in a controversy with any Union under the jurisdiction of the American Federation of Labor and if pickets are situated at the location where the delivery or pickup is to be made. If the customer or third person is not directly involved in a controversy with any union under the jurisdiction of the American Federation of Labor and if pickets are situated at the location, the members of the Union shall make deliveries to or pickups from such customers or third person for at least 48 hours after the Union has discussed the situation with the Employer; if the Employer, any of its divisions, subsidiaries or affiliates are directly or indirectly involved in a controversy with any Union, the members of the Union shall make deliveries or pickups for at least 48 hours after the Union has discussed the situation with the Employer; thereafter it shall not be a violation of this Agreement for failure to make deliveries or pickups, but the Employer reserves any and all rights it may have, except any rights based on a contractual claim for such failure.

"(d) It shall not be a violation of this Agreement for members of the Union to refuse to handle material in the possession of the Employer received from any employer with whom Local 338, or Local 584, or Local 602, or Local 607, or Local 680 is directly engaged in a labor dispute, provided such material comes into the Employer's possession more than 48 hours after the Union gives written notice to the Employer of the existence of such labor dispute. It shall not be a violation of this Agreement for the members of the Union to refuse to make deliveries to or pickups from any employer with whom Local 338, Local 584, or Local 602 or Local 607, or Local 680 is directly engaged in a

labor dispute, provided such refusal occurs more than 48 hours after the Union has given written notice to the Employer of the existence of such labor dispute."

From a reading of the above subdivisions (c) and (d) of Paragraph 18 of the collective bargaining agreement, it is apparent that while subdivision (c) refers generally to controversies with "any union under the jurisdiction of the American Federation of Labor," subdivision (d) specifically refers to a labor dispute involving Local 584. Consequently, it is the applicability of subdivision (d) which is in question here.

The first sentence of subdivision (d) relates to the handling of material in the possession of the secondary employer (here A and B dealers) "received from" a primary employer (here the C dealers) with whom Local 680 is directly engaged in a labor dispute. Manifestly, this sentence is inapplicable in the instant case because on the original hearing it was brought out that the B dealers do not *receive* any material from the C dealers. On the contrary, the milk bottles and cases belong to the B dealers and the milk is received by the C dealers from the B dealers.

If the B dealers are to be deemed to have consented in advance to the boycotting of C dealers who did not sign contracts with the union, this consent must be found, if at all, in the language of the second sentence of subdivision (d). Pursuant to this sentence, the secondary employer has agreed with the union that its employees need not make "deliveries to or pickups from" a primary employer with whom the union was directly engaged in a labor dispute. From the facts in this case it appears that the C dealers arrive at the platforms of the B dealers, where the cases of milk are loaded onto the former's trucks. The loading procedure is not uniform; in some instances the employees of the B dealers perform this task and in other instances, the C dealers load their own trucks.

Clearly, the loading operations do not entail "pickups from" the C dealers with-in the meaning of the second sentence of subdivision (d). With respect to the word "deliveries" it is also apparent that this word does not cover those instances where the C dealers load their own trucks, since cases of milk which are on the platforms and destined for *pickups by* (as distinguished from the words "pickups from") the C dealers cannot be said to have been "delivered to" them. Nor do I believe that the Board's position is unreasonable in its contention that the "deliveries" and "pickups" as used in subdivision (d) refer to truck transportation, or at least something more than mere platform operations. (The same reasoning as to such terms would apply to subdivision (c)).

Moreover, it is the contention of the Board that a B dealer's refusal to boycott C dealers who have not signed contracts with the union does not thereby directly engage the union in a labor dispute with said B dealer so as to justify the union's demands upon the A dealers that they boycott the recalcitrant B dealer. This claim is not without merit on this application for a temporary injunction.

A refusal to grant the Board's application for a temporary injunction will result in serious and irremediable harm, whereas a granting of the application would not seriously damage or inconvenience the respondent-union.

Conclusions of Law

1. There is great doubt as to the applicability of the so-called "hot cargo" clause, as set forth in Paragraph 18 of the collective bargaining agreement, to the facts in this case.

2. There is reasonable cause to believe that the respondent-union has engaged in and threatens to continue to engage in unfair labor practices in violation of Section 8(b) (4) (A) and (B) of the National Labor Relations Act.

3. The petitioner is entitled to a temporary injunction pursuant to Section 10(*l*) of the Act.

Settle order on notice.