Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 202, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent.

United States District Court
S. D. New York.

March 18, 1965.

Martin M. Arlook, New York City, for petitioner National Labor Relations Board.

Morris J. Kaplan, New York City, for respondent.

LEVET, District Judge.

This is an application for a temporary injunction to enjoin and restrain the respondent, its officers, agents, representatives, servants, employees, attorneys, etc. from certain acts hereinafter mentioned.

The petitioner, Regional Director of the Second Region of the National Labor Relations Board (hereinafter called the "Board"), alleges that the respondent is a labor organization within the meaning of Sections 2(5), 8(b) and 10(l) of the National Labor Relations Act, 29 U.S.C. § 141 et seq. (hereinafter called the "Act"), and has its principal office in this judicial district and is engaged here in transacting business and in promoting the interest of its employee members.

The said Director petitions this court for and on behalf of the Board, pursuant to Section 10(l) of the Act, as amended (61 Stat. 149, 73 Stat. 544, 29 U.S.C. § 160(l) for appropriate injunctive relief pending the final disposition of the matters involved herein pending before the Board on a charge alleging that respond-

ent has engaged in, and is engaging in, acts and conduct in violation of Section 8(b) (7) (A) of the Act.

The petitioner further alleges that on January 11, 1965, Kane-Miller Corp. (hereinafter called "Kane-Miller"), pursuant to provisions of the Act, filed a charge with the Board alleging that respondent above named, a labor organization, has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(b) (7) (A) of the Act. A copy of said charge was attached as Exhibit 1 and made a part of the petition; and that the said charge was referred to petitioner as Regional Director of the Second Region of the Board. This charge against the respondent herein was as follows:

"Since on or about January 9, 1965, the above-named labor organization by its agents and representatives, has threatened to picket, has picketed and caused to be picketed Kane-Miller Corp., an Employer, with an object of forcing or requiring said Employer to recognize or bargain with said labor organization as the representative of its employees and of forcing or requiring the Employees of said Employer to accept or select said labor organization as their collective bargaining representative when the Employer has lawfully recognized in accordance with the Act, another labor organization and a question concerning representation may not appropriately be raised under Section 9(c) of the Act."

The petitioner also states and alleges that he has reasonable cause to believe that the said charge is true and that a complaint of the Board based on said charge should issue against respondent pursuant to Section 10(b) of the Act. The petitioner, it is stated, has reasonable cause to believe, and believes, that the respondent is engaged in and is engaging in acts and conduct in violation of Section 8(b) (7) (A) of the Act affecting commerce within the meaning of Section 2(b) and (7) of the Act.

The petitioner thereafter sets forth the acts and conduct which are in violation, it is stated, of the said Act. These, in addition to the aforesaid allegations of the nature of the respondent-organization and its principal place of business, which are admitted, are as follows (paragraph 5 of petition):

"(c) Kane-Miller is engaged at Yonkers, New York, in the business of purveying food products to institutions, hotels, steamships and restaurants. In the operation of its business, Kane-Miller annually ships products valued at more than $50,000 to customers outside the State of New York.

"(d) On May 25, 1964, Kane-Miller and Thorman, Baum & Co., Inc. (herein called Thorman-Baum) executed a contract of purchase and sale to take effect January 9, 1965, whereby Kane-Miller acquired certain of the assets of Thorman-Baum with respect to the latter's fresh and frozen fruit and vegetable purveying business. Notice of the pending liquidation of Thorman-Baum's business was given to respondent.

"(e) Respondent, until the expiration of its collective bargaining contract with Thorman-Baum on January 8, 1965, has been the collective bargaining representative of Thorman-Baum's employees in a unit of chauffeurs, warehousemen and helpers.

"(f) Respondent is not currently certified as the representative of any Kane-Miller's employees.

"(g) Since prior to 1939, Kane-Miller has recognized Local Union No. 445, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (herein called Local 445), a labor organization within the meaning of Section 8(b) (7) of the Act, as the collective bargaining representative of its employees in a unit composed of chauffeurs, drivers, warehousemen, and helpers, and has had successive collective bargaining contracts with Local 445, the most recent of which is effective from June 30, 1962 to July 1, 1965, and contains a valid union security clause.

"(h) Notwithstanding the aforesaid, respondent, since on or about August 27, 1964, has demanded that Kane-Miller recognize and bargain with it as the representative of those employees of Kane-Miller, be they former Thorman-Baum employees or otherwise, who were to fill additional positions made necessary by the aforesaid acquisition of Thorman-Baum's fresh and frozen fruit and vegetable purveying business.

"(i) In furtherance of the aforesaid demands, respondent, on or about January 15, 1965 and since said date has picketed and caused Kane-Miller to be picketed.

"(j) On December 11, 1964, respondent filed a charge with the Board alleging, *inter alia,* that Kane-Miller engaged in unfair labor practices in violation of Section 8(a) (2) of the Act, but said charge was subsequently withdrawn.

"(k) Except as set forth in subparagraph (j) above, no charge has been filed with the Board under Section 8(a) (2) of the Act alleging that Kane-Miller unlawfully recognized or entered into the current contract with Local 445, and at no time material herein could a question concerning representation of Kane-Miller's employees composed of chauffeurs, drivers, warehousemen and helpers appropriately be raised under Section 9(c) of the Act.

"(l) An object of respondent's acts and conduct set forth in subparagraph (i) above was and is to force or require Kane-Miller to recognize or bargain with respondent as the representative of Kane-Miller's chauffeurs, drivers, warehousemen and helpers, notwithstanding that respondent is not currently certified as the representative of such

employees, Kane-Miller has lawfully recognized in accordance with the Act another labor organization as the representative of such employees, and a question concerning the representation of such employees may not appropriately be raised under Section 9(c) of the Act."

The petitioner further states:

"(6) It may fairly be anticipated that, unless enjoined, respondent will continue or repeat the acts and conduct set forth in paragraph 5, subparagraphs (i) and (l) above, or similar or like acts and conduct in violation of Section 8(b) (7) (A) of the Act. It is therefore essential, appropriate, just and proper, for the purpose of effectuating the policies of the Act, and in accordance with the provisions of Section 10(l) thereof, that, pending final disposition of the matters involved herein pending before the Board, respondent be enjoined and restrained from the commission of the acts and conduct above alleged, similar acts and conduct, or repetitions thereof.

"(7) No previous application has been made for the relief herein sought."

The respondent filed an answer to the said petition. A hearing on the issues raised by the petition and answer was duly held commencing March 9, 1965 and continuing to March 11 and 12, 1965.

During the hearing the court allowed the petitioner to amend its petition by adding the following sentence to paragraph 5(j):

"On February 25, 1965, respondent filed a new charge with the Board again alleging *inter alia*, that Kane-Miller engaged in unfair labor practices in violation of Section 8(a) (2) of the Act. Petitioner refused to issue a complaint on said charge and so notified respondent by letter dated March 1, 1965."

The respondent filed an answer consisting of nine separate defenses. The Fourth, Fifth, Sixth and Seventh defenses were stricken by the court. The respondent, by an amendment to the answer, raised a defense directed to the above amendment of the petition (i. e., to paragraph 5(j)).

The gist of respondent's opposition to a preliminary injunction appears to be set forth in its brief after trial, which presented the following points:

"POINT I
"PETITIONER'S APPLICATION FOR INJUNCTIVE RELIEF IS PREMATURE. THE GENERAL COUNSEL HAS NOT DETERMINED WHETHER A COMPLAINT SHOULD ISSUE ON RESPONDENT'S 8(a) (2) CHARGE."

"POINT II
"KANE-MILLER IS SUCCESSOR TO COEMPLOYER WITH AND AGENT OF THORMAN BAUM AND THORMAN BAUM IS AGENT OF KANE-MILLER."

"POINT III
"THE BARGAINING UNIT UNDER THE KANE-MILLER—LOCAL 445 AGREEMENT DOES NOT PROVIDE FOR OR COVER ORDERMEN, FREEZERMEN OR HELPERS AND DRIVERS WORKING ON FRESH AND FROZEN FRUIT AND VEGETABLES AND A QUESTION CONCERNING REPRESENTATION OF EMPLOYEES IN THE THORMAN BAUM DIVISION MAY APPROPRIATELY BE RAISED."

"POINT IV
"PETITIONER HAS NO REASONABLE CAUSE TO BELIEVE THE 8(b) (7) (A) AGAINST RESPONDENT IS TRUE."

Now, after hearing the petitioner's counsel and counsel for the respondent, after the presentation of all relevant testimony submitted, after opportunity had been had to examine and cross-examine witnesses, after receiving proposed findings of fact and conclusions of law from the petitioner and from the respondent, and after considering the

petition, answer, evidence, arguments and memoranda and upon the entire record, and for the purposes of this motion only, I find that the essential elements of the allegations of the petition heretofore stated by me have been sustained and in addition and in amplification thereof I find as follows:

1. *Kane-Miller and Its Purchaser.*

(a) Kane-Miller is a corporation engaged in purveying food to institutions. (37) Kane-Miller's sales orders have been and are distributed to a radius of 150 miles, to New Jersey, Connecticut, upstate New York, Massachusetts, Pennsylvania and at certain times to Maine. (61) Kane-Miller deals with Local 445, IBT as a collective bargaining agency in respect to its employees, i. e., warehousemen, chauffeurs and helpers. (37) The Kane-Miller warehouse is now located at 1120 Saw Mill River Road, Yonkers, New York. (38) On or about May 25, 1964, Kane-Miller entered into a contract to purchase certain of the assets of Thorman, Baum, which conducted a business on 14th Street in New York City. (41; Ex. 4) The contract, Exhibit 4, was consummated by a bill of sale and the payment of the purchase price on January 9, 1965 (42, 43), which amounted to a total of $550,000, of which about $240,000 was paid in checks to Thorman, Baum and the balance (in checks) to its creditors. (44, 231, 232)

(b) The substance of this contract (Ex. 4) was as follows:

(1) The seller (Thorman, Baum) was to sell to Kane-Miller certain assets of the Thorman, Baum business, including merchandise inventory and usable supplies, furniture, machinery and equipment;

(2) Also sold were the private labels, brand names and trademarks owned by the seller, the seller's telephone numbers, the right to use the name, "Thorman, Baum" as the name of a division or department of the purchaser, the right to use the name, "Tested Best Frozen Food." The accounts receivable were also sold.

(3) Paragraph 9 of the agreement was as follows:

"Notwithstanding any provisions in this contract to the contrary, it is expressly agreed that the Purchaser assumes no obligations of the Seller, which are of a labor relations nature, whether arising out of the existing collective bargaining contract between the Seller and Local Union No. 202, I. B of T, C. W & H of A. dated January 18, 1963, or otherwise; the parties acknowledge that because the Purchaser has a collective bargaining contract with Local Union No. 445, L. B. of T. C. W & H of A. covering an appropriate bargaining unit, the interests of preserving industrial peace would not be served by the Purchaser's assumption of any obligations of the Seller which are of a labor relations nature." (Ex. 4)

(4) Employment agreements with Harry Gruntwagin, Maurice H. Kasov, Morris Schwartz and Maxwell Treewater were to be delivered at closing. (Paragraph 10)

(5) The purchaser agreed to give at closing certain stock option agreement to the four persons just mentioned. (Paragraph 11)

(c) Prior to the time of the consummation of Thorman, Baum's sale to Kane-Miller, i. e., on January 9, 1965, Thorman, Baum's contract with Local 202, which had been Thorman, Baum's collective bargaining unit for many years, had expired, (233, Ex. 10) and at that time Kane-Miller had and now has an existing and valid contract with Local 445.

2. *The Transfer of January 9, 1965.*

(a) Prior to the said purchase, Kane-Miller employed about thirty warehousemen, helpers and truck drivers. (46) Kane-Miller supplied its customers with canned and packaged food, fruits, vegetables, juices, beans, rice, staple food diet items, bakery supplies, paper goods, pots and pans, etc. (47, 48) After January 9, 1965, Kane-Miller added frozen foods and fresh produce. (48) Before, Kane-

Miller had operated at 81 Clinton Street in Yonkers. (101) Merchandise and other items from Thorman, Baum (at 14th Street) were moved on January 7th to 9th to 1120 Saw Mill River Road, Yonkers, New York. (102) This merchandise, etc. was inventoried as it reached 1120 Saw Mill River Road and was paid for on January 9, 1965. (106–111)

(b) Kane-Miller bought certain trucks from two rental companies. (128) Apparently, these trucks had been used by Thorman, Baum and on some of these trucks the name "Thorman, Baum" had been inscribed. These were employed for the delivery of Kane-Miller products together with Kane-Miller's own trucks— that is, some bore one name and some the other. (129–130) An order has been placed for decals to convert the entire fleet in the near future. (130)

(c) On or about January 9, 1965, Kane-Miller also moved from Clinton Street into its newly constructed warehouse at 1120 Saw Mill River Road where it had 95,000 square feet with a height of twenty feet against 40,000 square feet in its former location (141–42); by reason of this factor of increased space and by reason of the addition of the sale of frozen food and vegetable products (48, 49) Kane-Miller, commencing January 9, 1965, hired 30–35 additional employees, i. e., chauffeurs, warehousemen and helpers from other sources than Thorman, Baum. (54) Approximately 17 were truck drivers, the remainder, warehousemen and helpers. (55)

(d) Kane-Miller, on or about January 9, 1965, employed three former management officials of Thorman Baum (112), to wit: Maxwell Treewater as Credit and General Manager of Kane-Miller (229); Morris Schwartz and Maurice H. Kasov, Sales Department, in supervisory capacities but in direct sales, having nothing to do with the rest of the organization. A contract with Maxwell Treewater, who had been Treasurer of Thorman, Baum (229) was executed in writing (Ex. B). (113–114) Schwartz was an officer of Thorman, Baum (120) and is employed pursuant to a written agreement with Kane-Miller. (121; see Ex. C)

(e) An employment agreement was executed by Kane-Miller and Kasov. (132; Ex. D) A one-month temporary job was given to Henry Gruntwagin. (133) This was by a letter agreement. (134; Ex. E) Gruntwagin actually worked only a period of one month, until about February 9. (135)

Treewater conceded that he was now a stockholder of Kane-Miller and had an option to buy stock under his employment agreement. (295) In explanation, Treewater said he owns altogether 1,000 shares (out of Kane-Miller's outstanding total of 375,000 shares), which he bought through a broker on the market. (373–74)

Under his contract with Kane-Miller, dated January 9, 1965, Treewater was employed to December 31, 1966 with two-year options thereafter if exercised by Kane-Miller. (Par. 2) His salary was fixed at $15,600 a year and in addition he received $65.00 weekly for expenses and the use and maintenance of an automobile. (Par. 3) In addition to salary, Treewater was to be paid one-third of the net profits before taxes in each fiscal year of the "Thorman Baum division or department" after deducting certain expenses and deductions specified. (Par. 4) His duties were those of a "management executive officer of the Thorman Baum division of the Employer, etc." "and such other executive duties as may be assigned by the Employer from time to time. (Par. 5, Ex. B)

Morris Schwartz and Maurice H. Kasov received similar contracts as management executive officers at like compensation. (Exs. C and D)

Gruntwagin received a short-term contract for four weeks, commencing January 11, 1965, to help organize the "frozen food and produce department" at Kane-Miller. (Ex. E) His service has now ended.

3. *Present Status of Thorman, Baum.*

Thorman, Baum is no longer in its former business of fresh and frozen foods and vegetables but is engaged in real estate in the owning of a building on West 14th Street, which it retained and

rented. This is the only activity of Thorman, Baum. This building was formerly used for the fresh and frozen food business of Thorman, Baum. (229–230)

4. *Preliminaries of Thorman, Baum Sale.*

(a) In March, 1964, Treewater, Treasurer of Thorman, Baum, notified Ullrich, President of Local 202, that because of his heart condition he was going to get out of business; that he wished to liquidate. Later, after trying to liquidate, he found it would be costly and, therefore, sought a purchaser. (244–45) Later, on May 21, 1964, he visited Ullrich, telling him he had a buyer and he would be able to sell the business. (246)

(b) *The Thorman, Baum Calendar*

In February 1964, Thorman, Baum procured the printing and manufacture of a certain calendar (Ex. G), similar to that of prior years. In the latter part of August 1964, after the contract with Kane-Miller had been signed, Thorman, Baum had imprinted on the metal back above the paper portion the words: "New Address: 1120 Old Saw Mill River Road, Yonkers, New York." (288) Some 600 of these calendars were distributed by Thorman, Baum for the new year, January 1, 1965, to its customers, that is, institutions, hospitals, schools, steamships. (290–91) However, Thorman, Baum did not disclose the distribution of these calendars to Kane-Miller and it never knew about it. (292) Treewater never showed a copy to any employee of Kane-Miller. (293) The new address on the calendar was not authorized by anyone from Kane-Miller and neither did Treewater consult with anyone at Kane-Miller in respect to the same. (378)

(c) *The Thorman, Baum Telephone Listing in the Westchester Directory.*

In August 1964, Treewater contacted the telephone company and made arrangements to have the following inserted in the classified section (Fruits & Vegetables—Whol.) of the Westchester County Directory: "Thorman, Baum & Co. Inc. After January, 1965, located 1120 Saw Mill River Road, Yonkers; 345 W. 14th Street, Manhattan, 212 AL 5–2505," (296–300) which number (i. e., 2505) was an error. (297) Thorman, Baum paid for this (298) but the publication was never brought to the attention of Kane-Miller. (299; see Ex. 8, admitted in evidence p. 300)

(d) *Thorman, Baum's Notice to the Trade.*

An undated notice, "TO OUR TRADE," signed by Thorman, Baum & Co., Inc., (Ex. F) was not discussed with anyone at Kane-Miller before it was issued. (375) This was sent because of rumors that Thorman, Baum was going out of business. (376) This notice reads in part as follows:

"THIS NOTICE IS TO INFORM OUR GOOD FRIENDS AND CUSTOMERS THAT WHILE AN ACQUISITION BY THE FIRM OF KANE-MILLER OF YONKERS, N. Y. IS TAKING PLACE ON OR ABOUT THE FIRST OF THE YEAR, THORMAN, BAUM & CO., INC. AND ALL PERSONNEL AND PRESENT MANAGEMENT WILL REMAIN INTACT AT ALL TIMES.

"THIS ACQUISITION WILL BE EFFECTIVE DEPENDENT UPON HOW LONG IT WILL TAKE TO COMPLETE OUR NEW FACILITIES WHICH INCLUDE THE MOST MODERN FREEZERS AND COOLERS, WHICH ARE NOW IN THE COURSE OF CONSTRUCTION IN THE CITY OF YONKERS.

"WE HOPE THAT WITH THESE NEW AND MODERN INNOVATIONS WE CAN BETTER SERVICE YOU PRICE AND QUALITY WISE." (Ex. F)

Thus, none of these acts by Thorman, Baum appear to bind Kane-Miller.

5. *Offers to Employees of Thorman, Baum.*

(a) At various times, to wit, in September 1964, at Thorman, Baum in New York (49, 50) and on October 31, 1964, at Westchester Town House in Tuckahoe

(50, 51) Kane-Miller offered employment to Thorman, Baum's employees, inviting them to make applications, telling them that Kane-Miller had a contract with Local 445 and that their employment would be under the jurisdiction of Local 445. (51, 52)

(b) At the meeting on October 31, 1964, to which the Thorman, Baum employees were invited, the officials of Local 202 were also present; Ullrich stated that Local 202 will be represented or "no trucks will roll." (262) Ullrich also told Kane: "We will have a picket line of fifty pickets if Local 202 is not represented." (263)

(c) On January 9, 1965, some six former employees of Thorman, Baum came to the new Kane-Miller warehouse, led by Vito Crescenti, the former shop steward for Local 202 at Thorman, Baum. (51, 52) Kane offered to accept applications, saying that the job hiring would have to be under Local 445 jurisdiction, but Crescenti said nobody would work under Local 445, that it had to be Local 202. Crescenti and the group then left. No former Thorman, Baum employees ever accepted employment with Kane-Miller as warehousemen or truck drivers. No Kane-Miller employees are represented by Local 202. (53)

(d) Treewater signed the contract of Thorman, Baum with Kane-Miller on May 25, 1964, and the next day, May 26, notified Ullrich. (246-48)

Ullrich told Treewater at this time that the "new people," Kane-Miller, would have to recognize Local 202. There were several meetings between Treewater and representatives of Local 202, ending December 10, 1964. (250-51) In the course of these meetings, Treewater offered a severance pay of $25,000 to the employees of Thorman, Baum if they kept their jobs and finished their contract until January 8, 1965. (253) This was first made in July 1964. The first offer had been $10,000, which was rejected on July 11. (253-54) Ullrich rejected the severance pay offer after consulting with Kaplan. (257-58; see also Ex. N, letter from Thorman, Baum to Ullrich, dated July 1, 1964)

6. *Demands for Recognition of Local 202.*

(a) At various times, Joseph P. Carey, an attorney representing Thorman, Baum, was present when Local 202 officials told him in substance that Kane-Miller must recognize Local 202. These dates were:

May 21, 1964 (392),

May 26, 1964 (393),

June 19, 1964 (395),

June 25, 1964 (396),

July 16, 1964 (397),

September 23, 1964 (399),

October 31, 1964 (399),

November 16, 1964 (400),

November 25, 1964 (401),

December 4, 1964 (401),

December 5 or 7, 1964 (402),

December 10, 1964 (402-403),

January 7, 1965 (404-405).

Carey at times was present at conferences with Mr. Kaplan, attorney for Local 202. (389) On February 19, 1964, Carey received word from Mr. Kaplan that the Joint Council 16 in a dispute initiated by Local 202 against Local 445 had awarded the jurisdiction to Local 202. (390) Mr. Kaplan asked Carey for conferences with Kane-Miller but ultimately Carey stated the parties were unwilling to meet. (391-92)

Kane, President of Kane-Miller, had certain conversations with Local 202 officials pertaining to recognition of Local 202, among which were the following:

(a) October 31, 1964, at which time Ullrich, President of Local 202, demanded recognition of that Local as to anyone handling fruits and vegetables. (70)

(b) December 10, 1964, at Kane-Miller's office, at which Ullrich, Kaplan (the union's attorney), Bagley (Secretary-Treasurer of Local 202) and Tedesco (the delegate) were present. (71) Ullrich stated that none of the Local 202 members would work under Local 445, that Kane-Miller must recognize Local 202 and suggested a dual arrangement

for a time and then a vote as between Locals 445 and 202. (72)

Benjamin H. Fried, an attorney representing Kane-Miller in connection with the purchase of Thorman, Baum had certain conversations with Local 202 representatives with reference to union representation of employees at Kane-Miller (216), as follows:

(a) On August 27, 1964, at which time Ullrich spoke to Fried, urging that Kane-Miller recognize Local 202 insofar as the men who would be working on frozen foods and produce were concerned, at least until the contract Kane-Miller had with Local 445 expired. (217-18)

(b) On September 23, 1964, Fried advised Ullrich and Kaplan that Kane-Miller discussed the matter with Local 445 and had been advised by that Local that it was the exclusive bargaining agent for the entire shop and would regard itself as such even after Kane-Miller started selling produce and frozen foods. (219) Kaplan urged that the purchase and sale was a merger and that Kane-Miller would be therefore in the role of successor to Thorman, Baum. Again, Kaplan and Ullrich urged Kane-Miller to recognize Local 202. (220)

(c) On December 4, 1964, Kaplan asked Fried whether Kane-Miller would consent to submit the issues to arbitration, but Fried stated he did not advise his clients to do so. (221)

On or about October 15, 1964, Local 202, by Charles Ullrich, President, sent a letter by Registered Mail to Kane-Miller, reading as follows:

"We wish to advise that the Agreement between your firm and this Local Union will expire on January 8, 1965.

"The Executive Board will schedule a conference for the purpose of negotiating new agreement in the near future.

"As soon as such a meeting can be arranged, we will advise you of the time and place of same." (Ex. 5)

As already stated, Kane-Miller had no contract with Local 202 at any time.

A similar letter, dated two days earlier, to wit, October 13, 1964, was sent by Registered Mail, a return receipt requested, addressed to Thorman & Baum Incorporated and Kane-Miller Corporation at 345 West 14th Street. (See Ex. M)

Kane-Miller has two subsidiaries known as Sacks Wholesale Fruit and Produce and K & S Foods, Inc., both at Liberty, New York. (95, 96) Each subsidiary had two collective bargaining units: *Local 202* for the two employees going to the New York market and *Local 445* for all others (96), but this dual arrangement recently expired. (99, 100) This was, however, one basis utilized by the union in demanding recognition at least for a portion of Kane-Miller's employees.

The three executives of Thorman, Baum above mentioned became executives of Kane-Miller under the terms heretofore mentioned but no former employees of Thorman, Baum were or are now employed by Kane-Miller. However, there was no evidence in the record to indicate that Thorman, Baum (or Kane-Miller) had ever promised to engage Thorman, Baum's former employees.

7. *Picketing of Kane-Miller.*

(a) Picketing at Kane-Miller by Local 202 commenced on January 9, 1965 and continued until date (72, 73), with the exception of a period from about February 12th to February 23rd. The pickets who paraded on the road leading to Kane-Miller's premises bore signs reading: "Tested Best Thorman, Baum on Strike, Kane-Miller Unfair to Labor. Local 202, I.B.T." (73, 75, 77; sign, see Ex. 6) The number of pickets ran anywhere from 15 down to 2. It averaged 6 for a period and then it became 4. The last day or two it was 2. (82, 83) On February 23rd the legend on the signs was changed to read: "Tested Best Kane-Miller Locked Out. Local 202, I.B.T." (85)

(b) Treewater also observed the picketing at the Kane-Miller plant on the afternoon of January 9, 1965. There were about 15 pickets. (265) Two of the

men had signs; the others congregated in a group of the bottom of the hill right in front of the plant, blocking the entrance. (266) There are two or three men every day now with the signs containing the aforementioned legend. (271) The picketing is presently continuing (March 11, 1965). (267) Treewater confirmed Kane's testimony as to the legends on the signs. (268, 270, 271)

(c) The aforesaid picketing affected Kane-Miller's business, with a loss of customers of a substantial dollar volume. (87) Apparently, the basis for loss on frozen foods and produce taken by Kane was that of the figures of previous sales of Thorman, Baum before acquisition. (200–203) Pickets accosted the drivers of outside delivery trucks, telling them not to cross the picket line, that Kane-Miller was unfair to labor, etc. (87, 88) Some of the trucks turned away; others were escorted through the picket line. (88) These trucks were bringing various merchandise for storage (and sale) at the warehouse. (89) As a result, many products were unavailable and some orders were not filled. (92) The quantity of business was cut down. (93) Apparently, about March 5, 1965 (276) Treewater saw a truck with merchandise at the bottom of the hill turned back by pickets. (273–74) The truck belonged to Langdon Trucking Company and contained 100 cases of frozen wax beans. The truck later came in. (274–75)

From all of the evidence in this case, the warnings of Local 202's officers, the signs carried by the pickets, the observations, particularly by Kane, who recognized certain of the pickets, the failure of Local 202 to offer any evidence to the contrary, I find that this picketing was activated by the officers in charge of Local 202.

8. *The Present Operations at Kane-Miller. Physical Operations*

(a) The personnel who had worked before January 9, 1965 and the new personnel are supervised at Kane-Miller without differentiation by the same persons. Added supervision became necessary due to the larger work staff. (63,

64) Both old and new employees receive the same wage and benefits. After the probationary period, the new employees become members of Local 445. (65) Both sets of employees commingle and work all over the plant. (66, 67) Kane-Miller never had an agreement with Local 202. (69)

(b) Five or six of Kane-Miller's present employees alternate with others to work at night, confining themselves to handling fresh produce when it arrives. (58, 59) The remaining daytime warehousemen perform their functions all over the plant (59), getting together merchandise from spots throughout the warehouse for the truck deliveries. The only persons assigned to specific areas are the men designated for the freezer. (60) These employees are utilized if they are to work a long time in the freezer; otherwise anyone can go in and get it. (61)

(c) The truck drivers take whatever loads they receive and deliver it to Kane-Miller's customers. They also pick up merchandise ordered by Kane-Miller. (56) The warehousemen take the order tickets, pick up in various spots in the warehouse merchandise required by these orders, bring the goods to the loading docks (platform) where the trucks are loaded. They also unload incoming merchandise and store it in the warehouse. (57)

(d) Aldo Corsetti, who was called by respondent, is a foreman at Kane-Miller, employed since January 11, 1965. Before, he was employed at Thorman, Baum as a supervisor and foreman where he supervised the flow and disposition of all the work at night, employees being about 20 in number (438–40) Corsetti's work covers the whole warehouse at Kane-Miller. (445) Corsetti stated that an order man would have to have a little knowledge of the items he is handling and to learn how to pack these different items into bags. "It just takes a little common sense, that's all," he said. In other words, as he phrased it: "You wouldn't take a tomato and put a bag of potatoes on top

of a tomato." Some experience is necessary. (458–59, 463–65)

At Kane-Miller, Corsetti supervises approximately 20 people at night, 17 of whom were warehousemen; three or four of whom drive trucks. (467–68) The warehousemen put up various kinds of goods, (468–71) take the orders to the truck. (468, 470–72) In the performance of the duties of the warehousemen they are not restricted to one particular food item, except in the instance of the freezer men. (474) The freezer men at times work outside. (475) The groceries are sometimes assembled in the grocery department and may have been trundled into Corsetti's department to be loaded on the truck with fruits, vegetables and frozen goods. (477)

The orders received call for frozen, fresh and canned items and are all put on a ticket and physically assembled by the 17 men. Corsetti goes around and shows them just what to do (482–83) throughout the entire warehouse, but not including the grocery department. The same warehousemen load the groceries, fruits, vegetables and frozen foods on one and the same truck which delivers to the customers. (485) There appears to be no material segregation of any kind with respect to the activities of the employees. (143–176)

(e) *New York Hospital Invoices.*

Treewater conceded that on February 3, 1965, one of the invoices of a delivery from Kane-Miller to the Coney Island Hospital was in the name of Thorman, Baum & Company. (315; Ex. I) According to Treewater, these billings in the name of Thorman, Baum were sales from Kane-Miller but were confined to deliveries to hospitals in the City of New York and consisted only of frozen foods by reason of the fact that the prior contracts of Thorman, Baum could not be changed because of the New York Municipal Regulations. (319–20) Treewater said that Kane-Miller had already made application to make the change but that it took a little time to process. (320) These invoices were used only for the City of New York billings. (321) Checks came to the order of Thorman, Baum & Company but are deposited in the Kane-Miller account. They are not deposited in any Thorman, Baum account. (322–23)

(f) *The So-Called "Thorman, Baum Division."*

The term "Thorman, Baum Division" merely indicates a method of bookkeeping, of determining whether the new business now operating as a part of Kane-Miller is making a profit (121–22) solely from a bookkeeping standpoint. As Kane expressed it: "In other words, being a perishable line, and being a line that requires certain electric power, and other things, which the grocery or the dry goods did not in the past, it is important to us, in order to pinpoint how our business is doing, to keep some bookkeeping records of the sales of produce and frozen foods" with a separate record of the costs. (122–23) Actually, there is no Thorman, Baum Division at this time, said Kane, and has not been. (124, 125) It is nothing but a separate cost accounting system. The employees were not segregated. (125)

(g) *The "Tested Best Foods Kane-Miller" Bank Account.*

The proceeds from the sale of fresh fruit and vegetables, including those billed to the New York hospitals in the name of Thorman, Baum, are deposited in the "Tested Best Foods Account" to ease the bookkeeping system and to keep a cost record. (326) This bank account is entitled, "Tested Best Foods Kane-Miller Corporation. (342) It is used to pay for various merchandise whether it is fresh, frozen, canned or anything else. (343–44) Treewater signs checks on this account. (324) However, the employees of Kane-Miller are not paid out of this account. (342) Treewater has no authority to sign salary checks on the Kane-Miller account, which is called the "Payroll Account." (344–45) No part of the receipts paid into the "Tested Best Foods Kane-Miller Account," above mentioned, flows into Thorman, Baum. (352) "Tested Best Foods" itself is a brand name. (325)

(h) *Certificate of "Tested Best Frozen Food Products."*

A Certificate of Doing Business in the name of "Tested Best Frozen Food Products" was filed in the County Clerk's Office in New York County, the City of New York, on or about January 5, 1959, in the names of four persons, to wit, Maxwell Treewater, Morris Schwartz, Maurice H. Kasov and Harry Gruntwagin. (334–35) These persons so named had been officers and employees of Thorman, Baum. (338) No amendment has been filed with respect to this Certificate. (339–40; see Ex. J, the Certificate, received in evidence p. 341) It does not appear that these persons now conduct any business in the name of "Tested Best Frozen Food Products" or otherwise. As already stated, the Thorman, Baum contract with Kane-Miller (Ex. 4) gave Kane-Miller the right to use the name "Tested Best Frozen Food" without representation of ownership or title, etc. (Par. 4C of Ex. 4)

(i) *Phillips & Cleary Company.*

Phillips & Cleary Company is a trade name. The principal was a salesman formerly with Thorman, Baum who now acts as a salesman for Kane-Miller, bringing in orders and receiving commissions; Kane-Miller ships the orders for him on his behalf. (386–88)

There is insufficient evidence to support a finding of any substantial continuity in the employer (Thorman, Baum) to establish Kane-Miller as the successor to Thorman, Baum or "that the Thorman, Baum industrial community was transferred to and operates intact at Yonkers." Kane-Miller consolidated the work of employees carrying on the operations of the fresh and frozen fruit and vegetable purveying business with the work of the employees carrying on the operations of the dry goods business.

The additional employees hired by Kane-Miller occupy classifications identical to those in existence prior to consolidation, to wit, warehousemen, drivers and helpers. The warehousemen do not constitute "skilled" employees, nor do they possess any special talents nor have

any special interests not possessed by the original employee complement of Kane-Miller with whom they were in effect commingled. The added employees are properly covered by Kane-Miller's existing collective bargaining agreement with Local 445.

## DISCUSSION

### I.

■ At the commencement of the hearing the court ruled that respondent's Point I (see p. 455 herein) was without merit. It is obvious that to sustain this contention of respondent would bar the Board from proceeding here solely because the respondent has initiated a charge against Kane-Miller subsequent to the initiation of the present charge by Kane-Miller against respondent. Clearly, this would be unreasonable. McLeod v. Local 239, Int'l Bro. of Teamsters, etc., 2 Cir., 330 F.2d 108 has no application here.

### II.

■ As previously indicated in my findings, factors sufficient to make Kane-Miller the "successor" to Thorman, Baum are absent here. Northwest Glove Co. Inc., 74 N.L.R.B. 1697; Johnson Ready Mix Co., 142 N.L.R.B. 437; Maintenance, Inc., 148 N.L.R.B. 114; Page Aircraft Maintenance, Inc., 123 N.L.R.B. 159. Cf. Piasecki Aircraft Corp., 123 N.L.R.B. 348.

Added employees, under the circumstances here existing, are properly covered by the existing collective bargaining contract with Local 445. J. W. Rex Co., 115 N.L.R.B. 775, enforced sub nom. N. L. R. B. v. J. W. Rex Co., 243 F.2d 356 (C.A. 3, 1957); Bowman Dairy Co., 123 N.L.R.B. 707. As noted by the Third Circuit in Rex, supra, 243 F.2d at page 359: "The question of unit determination is one within the particular expertise of the National Labor Relations Board, vested in that body by Section 9(b) of the Act."

■ No proof was submitted that respondent, after being notified by Thorman, Baum of its prospective sale to an

unspecified purchaser on May 23, 1964, sought negotiations with respect to the decision of Thorman, Baum to either terminate its business or sell its fresh and frozen fruit and vegetable business. Under these circumstances, respondent is in no position to claim that Thorman, Baum refused to bargain in respect to the sale of the business. See Motoresearch Company and Kems Corporation, 138 N.L.R.B. 1490, 1492–93.

 Assuming, arguendo, that Thorman, Baum refused to bargain with Local 202 in respect to sale, this provides no justification to Local 202 for picketing Kane-Miller. Again, assuming arguendo, that Kane-Miller is the "successor" to Thorman, Baum, this would provide no basis to impose responsibility upon Kane-Miller for any unfair labor practices which Thorman, Baum may have previously committed. Symns Grocer Co., 109 N.L.R.B. 347; N. L. R. B. v. Birdsall-Stockdale Motor Co., 208 F.2d 234, 46 A.L.R.2d 587 (C.A. 10).

Cases cited under Respondent's Brief, Point II, are inapplicable to the instant proceeding.

### III.

This court finds no merit in Point III of Respondent's Brief by reason of the factual findings heretofore made.

### IV.

Point IV of Respondent's Brief flies squarely in the face of the foregoing findings.

 As stated in Douds v. Milk Drivers and Dairy Employers Union, 154 F. Supp. 222, 234 (S.D.N.Y.1957), aff'd 248 F.2d 534 (2 Cir. 1957)

"The issuance of injunctions against unfair labor practices on petition of the National Labor Relations Board is designed to authorize speedy relief in cases where unfair labor practices threaten serious harm which may be irremediable under ordinary procedures provided under the statute. See Douds v. Wine, Liquor & Distillery Workers Union, Local 1, D.C.S.D.N.Y., 1948, 75 F. Supp. 447. Even where grave and difficult questions of law are involved and where an answer might disclose disputed issues of fact, preliminary injunction against enforcement of the statute pending final hearing will be granted where injury to the plaintiffs would be certain and irreparable if the application were denied, while granting of the application would not seriously damage and inconvenience defendants. See Independent Workers of Clayton Mark & Co. v. Beman, D.C.N.D.Ill., 1936, 13 F.Supp. 627."

 There is an adequate basis for the Board's finding that there was reasonable cause to believe that the charges filed here are true and there is reasonable cause to believe that respondent has engaged in, and is engaging in, acts and conduct in violation of Section 8(b) (7) (A)[1] of the National Labor Relations Act affecting commerce within the meaning of Section 2(6) and (7) of said Act, and that such acts and conduct will likely be repeated or continued unless enjoined.

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and of the subject matter of this proceeding and under Section 10($l$) of the

---

[1]. Section 8(b) (7) (A) provides as follows:

"Sec. 8(b) It shall be an unfair labor practice for a labor organization or its agents—

"(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

"(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9 (c) of this Act * * *."

Act is empowered to grant injunctive relief.

2. There is, and petitioner has, reasonable cause to believe that:

(a) Respondent is a labor organization within the meaning of Sections 2(5), 8(b) and 10(*l*) of the Act;

(b) Kane-Miller is engaged in commerce within the meaning of Section 2(6) and (7) of the Act;

(c) Respondent has engaged in unfair labor practices within the meaning of Section 8(b) (7) (A) of the Act, affecting commerce within the meaning of Section 2(6) and (7) of the Act, and a continuation of these practices will impair the policies of the Act as set forth in Section 1(b) thereof.

3. The petitioner is entitled to a temporary injunction pursuant to Section 10 (*l*) of the Act.

Accordingly, an order granting a temporary injunction has this day been signed.